# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

DAWN MARIE DIXON-BEY,

    Defendant-Appellant.

FOR PUBLICATION
September 26, 2017
9:05 a.m.

No. 331499
Jackson Circuit Court
LC No. 15-004596-FC

Before: O'BRIEN, P.J., and HOEKSTRA and BOONSTRA, JJ.

O'BRIEN, P.J.

Defendant, Dawn Marie Dixon-Bey, was arrested after admittedly stabbing her boyfriend, Gregory Stack, to death in their home on February 14, 2015. At first, she claimed that the victim must have been stabbed during an altercation with others before returning to their home. Later, however, defendant admitted that she was the person who stabbed the victim but claimed that she only did so in self-defense. She was subsequently charged with first-degree murder, MCL 750.316, and, after an eight-day jury trial, was found guilty of second-degree murder, MCL 750.317. She was sentenced to 35 to 70 years in prison and appeals as of right. On appeal, defendant argues that she was deprived of her constitutional right to a fair trial, that the trial court abused its discretion by admitting evidence about defendant's attempts to prevent the victim's daughter from having custody of her half-sister (the biological daughter of the victim and defendant), that she was deprived of her constitutional right to the effective assistance of counsel, that the trial court abused its discretion by admitting evidence about a previous occasion in which she had stabbed the victim, and that resentencing is required because the trial court unreasonably departed from the advisory sentencing guidelines range. For the reasons set forth below, we affirm defendant's conviction but vacate her sentence and remand for resentencing.

As indicated above, defendant argues on appeal, in part, that she was deprived of her constitutional right to a fair trial. Generally, she takes issue with the trial court's decision to qualify Detective Gary Schuette as an expert in interpreting evidence at a homicide scene. Specifically, she argues on appeal that she was deprived of her constitutional right to a fair trial because the trial court erroneously permitted Detective Schuette "to essentially tell the jury that [defendant]'s claim of self-defense was a sham based on his expertise." Defendant asserts that Detective Schuette was not permitted to offer such an opinion because he "was not qualified as an expert in behavioral science with regard to how people engaged in self-defense are expected

-1-

to act," because "his small sampling from personal experience would not support a peer-based review of experts," because his "testimony was speculative," and because the testimony "foreclosed any possibility that the jury would believe that Dawn acted in self-defense." While we agree with defendant's position that the admission of some of Detective Schuette's testimony was erroneous, we do not agree that reversal is required because defendant has not demonstrated that the admission of the testimony was outcome determinative.

"This Court reviews for an abuse of discretion a trial court's decision to admit or exclude expert witness testimony. This Court also reviews for an abuse of discretion a trial court's decision on an expert's qualifications." *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009) (citations omitted). "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *People v Young*, 276 Mich App 446, 448; 740 NW2d 347 (2007). "Questions whether a defendant was denied a fair trial, or deprived of his liberty without due process of law, are reviewed de novo." *Steele*, 283 Mich App at 478. A trial court's interpretation and application of a court rule, like a statute, is reviewed de novo. *People v Valeck*, 223 Mich App 48, 50; 566 NW2d 26 (1997).

At issue in this case are MRE 701 and 702, which govern the admissibility of opinion testimony. MRE 701 governs the admissibility of opinion testimony by lay witnesses:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

MRE 702 governs the admissibility of expert testimony:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As this Court has recognized before, the interplay between MRE 701 and MRE 702 when a police officer provides testimony based on his or her training and experience is somewhat unclear. See *People v Dobek*, 274 Mich App 58, 77; 732 NW2d 546 (2007) ("The caselaw on this issue is not entirely clear."). In *Dobek*, the prosecution offered the testimony of a police officer, Bruce Leach, "regarding delayed disclosure" in sexual-assault cases "as simply a police officer giving lay testimony based on his training and experience without . . . being first qualified as an expert, while suggesting to the jury that Leach was an expert on the subject." *Id*. at 76. The trial court ruled that the testimony was admissible as lay testimony and instructed the jury as such. *Id*. at 76-77. On appeal, defendant challenged this ruling, arguing that this testimony required that the police officer be qualified as an expert. *Id*. at 76.

This Court analyzed this issue as follows:

Because Leach was testifying about delayed disclosure on the basis of knowledge, experience, and training, it would appear that his testimony constituted expert opinion testimony and not lay opinion testimony under MRE 701, which is limited to opinions or inferences that are "rationally based on the perception of the witness" and that are "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." The caselaw on this issue is not entirely clear. For example, in *Chastain v Gen Motors Corp (On Remand)*, 254 Mich App 576; 657 NW2d 804 (2002), the trial court permitted a police officer to give lay opinion testimony under MRE 701 that the plaintiff was not wearing his seatbelt. This Court affirmed, rejecting the plaintiff's claims that the trial court should not have admitted evidence under MRE 701, that expert testimony under MRE 702 was necessary, and that the officer was not qualified to give an expert opinion on the issue. The *Chastain* panel held that the lay opinion was not admitted in error because the testimony was based on the officer's perceptions at the scene of the accident and because the opinion was not based on his past experience in investigating car accidents. *Chastain*, *supra* at 586-590. The Court stated, "A careful examination of [the officer's] testimony establishes that although his opinion in this case was consistent with conclusions he had drawn in other cases he had investigated, his past experience did not form the basis of his opinion." *Id*. at 590. Here, Leach's testimony on delayed disclosure was drawn from his past experiences and training.

In *Co-Jo, Inc v Strand*, 226 Mich App 108; 572 NW2d 251 (1997), the plaintiffs argued that an off-duty fireman's opinion testimony regarding the speed at which a building burned was improperly admitted as lay opinion testimony under MRE 701 because expert testimony was required and the fireman was not qualified as an expert. This Court held that the trial court did not abuse its discretion in admitting the opinion evidence regarding the speed and intensity of the fire. *Co-Jo*, *supra* at 117. The *Co-Jo* panel stated:

> [The fireman's] conclusions were based on observation of the fire for over thirty minutes. The opinion testimony was limited to describing the fire in relation to other building fires [the fireman] had witnessed. The reliability of his conclusions was premised on his extensive experience in observing other building fires and investigating their causes. The testimony was of a general nature, without any reference to technical comparison of scientific analysis. [*Id*.]

Under *Co-Jo*, it could be reasonably argued that Leach's testimony was acceptable lay opinion testimony. *Co-Jo* appears to be at odds with *Chastain*. We, however, do not need to resolve the issue, and the apparent conflict in caselaw gives credence to a conclusion that the prosecutor did not pursue the challenged questioning in bad faith. Assuming that expert testimony was required, Leach was more than qualified to give an expert opinion on delayed disclosure to the extent of the testimony actually presented. He testified at length about his extensive knowledge, experience, training, and education concerning the

-3-

sexual abuse of children. Leach has personally participated in the investigation of hundreds of criminal sexual conduct cases involving child victims. And he had received training in the investigation of cases involving delayed disclosure. With his background and experience in investigating child sex abuse cases and interviewing victims, Leach became knowledgeable regarding delayed disclosure, and, according to Leach, delayed disclosure is common and happens quite frequently with child victims. On this record, the disputed testimony was admissible, and the prosecutor acted in good faith in eliciting the testimony. Accordingly, reversal is unwarranted. [*Dobek*, 274 Mich App at 77-79 (alterations in original).]

In this case, the trial court qualified Detective Schuette "as an expert in interpreting evidence at . . . homicide scenes." In our view, the trial court did not err in this regard. Detective Schuette described, in detail, his extensive knowledge, skill, experience, training, and education with respect to homicide investigations. Specifically, Detective Schuette testified that he had participated in "[h]undreds" of homicide investigations, participated in extensive law-enforcement training including, for example, several "homicide schools" and "evidence technician school," and "taught Criminalistics which is processing of crime scenes, interpreting . . . crime scenes." In addition, Detective Schuette testified that, on previous occasions, he had testified as an expert in "[e]vidence interpretation and general homicide investigations." Ultimately, the trial court found this knowledge, skill, experience, training, and education sufficient for purposes of MRE 702, and we agree with that decision despite the fact that, as defendant claims, it may have been a rather "broad" qualification.

Whether Detective Schuette was permitted to offer an opinion as to whether defendant was acting in self-defense is a different, and more complicated, issue. As indicated above, defendant claims that Detective Schuette was allowed "to essentially tell the jury that [defendant]'s claim of self-defense was a sham based on his expertise." To support this claim, defendant points, in relevant part, to two portions of Detective Schuette's testimony at trial.[1]

---

[1] Defendant additionally points to a third portion of testimony that includes Detective Schuette's testimony that he, in essence, fed her the idea of self-defense when trying to determine whether or not she was a suspect. He testified that while interviewing defendant, he "noticed that there was some red marks on her hands" that "caused [him] to believe that maybe she was involved . . . ." Her potential involvement directly contradicted the original statement that she had made to Detective Schuette, as well as several other officers, that the victim sustained the ultimately lethal wounds in a fight prior to returning home. Detective Schuette testified,

As -- as that's developing more I began to talk to her a little bit more about Greg. And one of my strategies in a circumstance like this is to initially blame the victim. That is typically the easiest way and the most accepted way for a suspect to begin to speak with you. And the way that I do that is I start asking about whether or not the victim was a nice person, a bad person, a great guy, a bad guy, did he drink, did he do drugs? Things of that nature. And then begin to look for

First, she points to the following exchanges between the prosecutor and Detective Schuette regarding how individuals acting in self-defense generally act afterwards:

> *Q.* All right, and once you learned that there was two stab wounds, did that change your strategy or your focus at all?
>
> *A.* It did. I was surprised by the fact that there had been two stab wounds. I began to lean towards a little bit more away from -- I -- I should say it like this. The self-defense theory was slowly beginning to break apart and I believed that this was weighing heavily on the other side of self-defense. I was skeptical because I always want an autopsy report first, so I held off making any official report myself about it until I received the autopsy report a little bit later on in March.
>
> *Q.* Okay, and by the time you talked to several other individuals, looked at the autopsy report, listened to the interview from -- or not the interview, but the phone conversation with Megan Marshall and what you knew from your talking to Dawn Dixon-Bey, I'm gathering by what you're saying is that it's clear that you eventually lean away from a self-defense theory?
>
> *A.* Yes, probably the 23rd was a turning point in the investigation, not only from the -- the standpoint of receiving the autopsy results, the preliminary autopsy results via word of mouth from Officer Peters, but also in speaking with Mr. -- Mr. Gove and the prior statement that he had obtained from her.
>
> \* \* \*

clues as to whether or not that person -- excuse me, the interviewee is going to tell me that that -- that the victim was, "Hey, he was a bad guy" or -- or whatever the case may be "He was a drunk" or those kinds of things.

And then I -- I kind of lock onto them and then I begin to develop a strategy as to how to approach the victim and typically that's used through a self-defense claim. "Well, because he was a bad guy, you know, nobody blame you", "you know I would understand", "this is self-defense". You know, those kinds of things to kind of get over that hump of who did this. Because we were still there, as far as I was concerned, of, you know, who did this? We didn't know for sure and I was trying to get over that hump to make the determination of -- of her being a potential suspect.

We disagree with defendant's argument that this testimony constituted expert testimony, much less inadmissible expert testimony. Rather, Detective Schuette's recollection of a sequence of events is fact testimony, and witnesses are permitted to offer both fact and expert testimony. See, e.g., *People v Bynum*, 496 Mich 610, 635 n 43; 852 NW2d 570 (2014).

*Q.* All right, so it's safe to say based -- about the 23ʳᵈ was when your focus really starts to turn towards this wasn't self-defense?

*A.* Correct.

*Q.* All right, now you had indicated that you've done hundreds of homicide investigations?

*A.* Yes.

*Q.* All right, have you dealt with situations where there has been self-defense?

*A.* Oh, absolutely.

*Q.* All right, have you interviewed people who had actually been the person who used self-defense?

*A.* Yes.

*Q.* All right, in your experience do they tend to act a certain way?

*A.* Yes.

*Q.* And how is that?

*A.* They're very excited, crying often times, not always but often times they're crying, they're very excited. They are giving you all the information and then asking if they're in trouble afterward. I didn't mean it, they're telling me all sorts of different things. I had to do it, I didn't mean it, I hear a lot of that kind of rattle can statements that come from them. Probably the most important thing that I look for in that circumstance is the excitability and detail about how everything came about.

*Q.* Okay, now you had indicated -- I -- I guess is it fair to say that's not what you got from talking to Dawn Dixon-Bey?

*A.* No, it's not at all.

Additionally, defendant also points to Detective Schuette's testimony that the victim was likely laying down during the stabbing. In that regard, Detective Schuette testified, in relevant part, as follows:

*Q.* All right, and based off of the interviews that you've conducted, the autopsy results and your viewing of the crime scene, were you able to interpret that crime scene and -- and develop a theory of what you thought took place?

*A.* Yes.

*Q.* And what is that?

*A.* Well, first off --

*Q.* And I guess, what did you based on as well?

*A.* -- what I based that on was the evidence that was at the scene, the autopsy results and the information that I had gathered through other witnesses. The one constant in all of the information surrounding the statements Ms. Dixon-Bey had made was the dog cage. I noted that the dog cage was, in fact, in the living room, so that certainly could have been a factor in the assault or what had occurred.

\* \* \*

So, I began to hypothesize about it occurring in the living room and what I want to mention before I say this is that there were no other cuts, there were no defensive wounds on Mr. Stack.

*Q.* Why is that significant to you?

*A.* If she was attacking him or they're engaged in an altercation, the marks she had on her were readily apparent. The marks on him were not, there were none. There was none noted by the pathologist, there was none seen by the rescue personnel, there was none in -- in the autopsy photographs.

*Q.* So, that led you to believe what?

*A.* That led me to believe that he was in a state of surprise when this occurred. Likely he was lying down and I say likely, because I don't know, he could have been standing up against the wall, but likely there would have been some sort of transfer, some sort of item that I would -- had seen like a smearing or something of that nature that wasn't present. So, lying down made more sense, it gives you that pressure/counter pressure that's needed so the strength wouldn't -- wouldn't be as much to be able to plunge something into something that's static or something that's moving, there's more strength required in the moving. So, if it's static and the knife is plunged in, also there's a lot more force that can be exerted by someone who is smaller downward rather than upward or outward. So, plunged downward and then back up and then back in again, seemed to make more sense.

When we looked at the fingernail clippings of Mr. Stack, there was no DNA underneath them of Ms. Dixon-Bey which would be indicative of an assault that was occurring and he's fighting for his life and he's reaching out and grabbing, that would cause me to think, especially if he was standing up or in a standing area, it would cause me to think that he would have some sort of evidence on him of trying to save his own life. But, that didn't exist, so it caused me to believe that he was in an state of surprise when all of this occurred.

-7-

*Q*. Yeah, so based off your interpretation of the crime scene, is it fair to say you don't even believe there was a struggle?

*A*. Yes.

In our view, Detective Schuette's expertise did not extend to offering a profile on the "certain way" in which those who kill in self-defense act during interrogations. While it certainly appears that Detective Schuette has been involved in cases where individuals have claimed that they acted in self-defense, we cannot conclude that his participation in an unidentified amount of these cases qualifies him to offer expert opinions as to whether individuals act a "certain way" after killing in self-defense as well as whether defendant's behavior in this case was consistent with that "certain way." Detective Schuette's expertise was in the area of interpreting evidence at homicide investigations, not in psychology or some other behavior science, and nothing in record suggests that his knowledge, skill, experience, training, and education addressed such areas. While it is true that Detective Schuette need not necessarily be a psychologist to offer this type of testimony, it is equally true that he does need to maintain the requisite knowledge, skill, experience, training, and education to be qualified as an expert in such an area, and the record before us simply does not support a conclusion that he was adequately qualified to make sweeping "expert" generalizations about the demeanor of those who kill in self-defense. Consequently, we conclude that the trial court's decision to admit Detective Schuette's expert testimony in this regard fell beyond the range of principled outcomes.[2]

---

[2] Relatedly, without more information on the basis for Detective Schuette's assertions regarding the behaviors of individuals who kill in self-defense, we also have concerns with respect to the reliability of Detective Schuette's testimony on this topic. Detective Schuette did not disclose how many interviews of individuals who kill in self-defense he conducted, nor did he explain how he determined that the people interviewed had in actuality acted in self-defense. Cf. *People v Kowalski*, 492 Mich 106, 131-133; 821 NW2d 14 (2012) (opinion by KELLY, J.). Furthermore, he did not claim familiarity with literature, peer-reviewed or otherwise, to support the assertion that people who kill in self-defense react in a certain way during police interviews or that the lack of such behavioral characteristics is inconsistent with a claim of self-defense. Cf. *id.*; *Dobek*, 274 Mich App at 96. Given Detective Schuette's failure to provide any support for his personal behavioral-science theories, it is notable that at least one court has disallowed testimony from police officers with respect to how someone who kills in self-defense should act after the fact, noting that "predictions of specific human behavior in response to traumatic experiences and opinions based thereon have not yet reached the level of scientific reliability to be worthy of admission as evidence in a court of law." *Ordway v Commonwealth*, 391 SW3d 762, 775-777 n 6 (Ky 2013). That court reasoned that "how guilty people typically behave" or "how innocent people do not act" were not legitimate subjects for expert opinion. *Id.* We share these concerns, both in terms of the reliability of such expert demeanor evidence generally and, more specifically, in terms of whether Detective Schuette was qualified to offer such opinions. Overall, by allowing him to offer testimony on the behaviors of those who kill in self-defense and to then testify that defendant did not behave in this manner, the trial court allowed Detective

Similarly, we also conclude that Detective Schuette's expertise did not extend to offering opinions with respect to the force necessary to stab someone through the chest and into the heart. Central to Detective Schuette's testimony with respect to what he believed happened was his opinion that defendant lacked the requisite "extraordinary amount of strength" to stab the victim twice while he was supposedly standing and acting as the aggressor. However, there is nothing in the record that supports Detective Schuette's basis for his opinions regarding force. Furthermore, while it is true that, as described above, Detective Schuette does maintain the requisite knowledge, skill, experience, training, and education to testimony as an expert in the interpretation of homicide scenes, we are unable to find anything in his testimony with respect to that knowledge, skill, experience, training, and education that might support a conclusion that knowledgeable, skilled, experienced, trained, and educated to ascertain the amount of force necessary to stab a human heart. Cf. *People v Hartford*, 159 Mich App 295, 303; 406 NW2d 276 (1987) (allowing a police officer to testify as an expert regarding gunshot wounds when the officer had completed "both undergraduate and graduate courses in homicide investigation which included the topic of specific information that can be obtained from examining gunshot wounds"). In fact, even Detective Schuette acknowledged that there was no objective way to "test" his theory and that he lacked the ability to actually "measure" the amount of force necessary to stab someone. We also find it noteworthy that the pathologist whose reports were relied upon by Detective Schuette in offering his opinion expressly testified that the amount of force necessary was depending upon the sharpness of the knife, a factor that could not be considered in light of the fact that it was never found.[3] In other words, Detective Schuette's

---

Schuette to venture into an area beyond his stated expertise and to offer unreliable "expert" opinions based on nothing more than an unspecified number of interviews with people who had purportedly killed in self-defense.

[3] More specifically, the pathologist explained that the victim had been stabbed twice in the heart, and that either wound would have been fatal. When asked about the force involved in the stabbing, the pathologist testified as follows:

*Q*. In order for a - - an object to actually puncture through the chest and get to the heart what does it have to go through to get to the heart?

*A*. Has to go first, the skin, then the muscle, then the - - in this case there was a - - some cartilage, and then the pericardium. The pericardium is a sac that involves the heart. And then the muscle of the heart. It has to go through all of these parts in order to penetrate inside the heart.

*Q*. In your experience how much force would - - would that take to make it through all that?

*A*. This questions [sic] come all the time. How - - how - - how much force is needed? Depends on many factors. First, is the knife really sharp? It's like cutting any kind of meat. When you're cutting a steak, or you kill a deer and you're cutting. Sometimes depends if you really working the knife, you - - (undecipherable) - - hard time. It's the same in - - in the human skin. The skin is

-9-

premise that the stabbing would require considerable force is not supported by the medical testimony in this case, and Detective Schuette does not appear to have the scientific, technical, or specialized knowledge necessary to form his own independent opinion of the force necessary to stab the victim through the chest into the heart, particularly when the knife used in the stabbing had not been recovered. Absent a sound basis for a major premise underlying his opinion, Detective Schuette's theory of the killing amounted to nothing but speculation, and these unreliable speculations could not assist the jury. Consequently, we conclude that the trial court's decision to admit Detective Schuette's expert testimony in this regard fell beyond the range of principled outcomes.

Nevertheless, while it is our conclusion that Detective Schuette's testimony as described above was erroneously admitted, we ultimately conclude that defendant has not demonstrated that the error was outcome determinative. See *People v Coy*, 243 Mich App 283, 304; 620 NW2d 888 (2000). The ultimate issue before the jury was whether defendant acted in self-defense, i.e., whether the victim lunged at her and essentially impaled himself on the knife as claimed by defendant or whether she stabbed the victim while he lay on the couch as claimed by the prosecution. Defendant presented her version of the events leading up to the victim's death at trial through her and other witnesses' testimony; likewise, the prosecution presented its version of the events leading up to the victim's death through various witnesses' testimony. While the testimony at issue went directly to this ultimate issue and was relied on by the prosecution during its closing argument, it is our view that, considering the record as a whole, Detective Schuette's testimony was not the only evidence undermining defendant's self-defense claim. That is, without the testimony at issue, the record reflects a variety of evidence that significantly undermined defendant's self-defense claim. For example, defendant initially denied stabbing the victim and stated that the victim came home with a stab wound. It was only later that defendant began to claim self-defense, after the possibility of self-defense had been suggested to her by police. "[C]onflicting statements tend to show a consciousness of guilt," and "[a] jury may infer consciousness of guilt from evidence of lying or deception." *People v Unger*, 278 Mich App 210, 225, 227; 749 NW2d 272 (2008). Further, although defendant claimed that

---

a little tough to get in but once the skin is taken away - - inside - - everything inside is so soft that doesn't require much force to do it - - only the skin.

*Q*. Okay. What about getting . . . out of that same area? Would that require more force, less force, or does it depend?

*A*. It depends also the sharpness of the knife. Because when you are pulling out if it's really well - - a good knife is going to come out easy. When you are - - tried to take out. If you are going to pull again, then it's going to be easier because there is already some injury to the skin that allow it to go in so easy.

Similarly, on cross-examination, the pathologist stated that with a "quality blade," "you don't need anything" in terms of force while, in comparison, "if you use something that is really rough, of course, it's going to require a lot of force." Further, the pathologist specified that he could not determine what type of knife caused the wounds, he could not tell how sharp the knife was, and he could not offer an opinion on the amount of force necessary without having the knife.

-10-

she put the knife down in the house, the weapon was not found in the house, and efforts to hide or suppress evidence can also be seen as indicative of consciousness of guilt. See *id.* at 226. While defendant claimed the altercation took place in the kitchen, the testimony indicated that there were no signs of a struggle in the kitchen. Likewise, the victim had no injuries or signs of defendant's DNA on his person to suggest that he had been in a physical altercation prior to the stabbing. Perhaps most significantly, in terms of medical evidence, the pathologist explained that there were *two* distinct stab wounds in the heart that could have been inflicted through one hole in a shirt and that neither wound was the result of surgical intervention. This contradicts defendant's testimony that she only stabbed the victim once, and it undercuts her claim of self-defense insofar as it seems excessive, even if threatened, to inflict two fatal stab wounds to the heart. In addition, evidence was introduced which indicated that, in the past, defendant had threatened to stab the victim and that she had actually stabbed the victim during fights.

In addition to the strong evidence of defendant's guilt, the risk that the jury might give undue weight to Detective Schuette's testimony was alleviated to some extent by a proper jury instruction on expert testimony, including the fact that the jury did not have to believe the expert's testimony and instructions on evaluating expert testimony. See *Kowalski*, 492 Mich at 137 n 74; *People v Peterson*, 450 Mich 349, 378; 537 NW2d 857 (1995). Further, defense counsel effectively challenged Detective Schuette's theory and credibility at trial. For instance, defense counsel cross-examined the detective on flaws in his theory, including the fact that his testimony on "force" was not in accord with the pathologist's opinions. During close arguments, defense counsel then vigorously argued that his version of events was simply "one man's theory that is not supported by the physical evidence and in some instances is contrary to the evidence." Additionally, on cross-examination, Detective Schuette conceded that a 170 pound man, such as the victim, lunging at a knife would create enough force to penetrate to the heart, which was a proposition that the pathologist would not confirm or deny, meaning that, to some extent, the defense arguably benefited from Detective Schuette's "expert" testimony on this topic. Cf. *Peterson*, 450 Mich at 377. Overall, given the strong evidence of defendant's guilt, it does not appear that the introduction of Detective Schuette's expert opinion testimony on self-defense affected the outcome of the trial, and thus defendant is not entitled to relief on appeal. We therefore conclude that, while the testimony at issue was erroneously admitted, its admission was not outcome determinative and does not entitle defendant to appellate relief.

On appeal, defendant also argues that the trial court erred by admitting evidence of defendant's attempts to prevent MM, the victim's biological daughter, from having custody of her half-sister, JS.[4] During trial, MM testified that, on the day after defendant killed the victim,

---

[4] JS is undisputedly the victim's biological child; however, it appears that she was not, at the time of the victim's death, his legal child. This apparently led to a contentious custody dispute, which the Department of Health and Human Services (DHHS) eventually became involved in. This dispute was made more complicated because, despite being in a long-term relationship with the victim, defendant remains married to another man, who, under Michigan law, would presumptively be the child's legal father. See *In re KH*, 469 Mich 621, 634; 677 NW2d 800 (2004) ("The presumption that children born or conceived during a marriage are the issue of that marriage is deeply rooted in our statutes and case law.").

JS was at her baby shower and wanted to stay with her afterwards, but defendant would not allow it. MM also testified that defendant's other daughters blamed her for DHHS's eventual involvement in JS's life. Defendant claims that this testimony was both irrelevant and unfairly prejudicial. In essence, defendant asserts, "it characterized Dawn as an evil person intent on destroying [JS]'s life in order to spite [the victim]'s family."[5] We disagree.

As indicated above, a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Steele*, 283 Mich App at 480. First, defendant argues that the testimony at issue was irrelevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevant evidence is admissible; irrelevant evidence is not. MRE 402. "Evidence that a defendant made efforts to influence [a] witness is relevant if it shows consciousness of guilt." *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010). Second, defendant argues that the testimony at issue, assuming it was relevant, was unfairly prejudicial. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. MRE 403 does not prohibit prejudicial evidence; rather, it prohibits evidence that is *unfairly* prejudicial. *People v Mardlin*, 487 Mich 609, 614-616; 790 NW2d 607 (2010). In essence, evidence is unfairly prejudicial when there exists a danger that marginally probative evidence might be given undue weight by the jury. *People v Feezel*, 486 Mich 184, 198; 783 NW2d 67 (2010).

In our view, MM's testimony was relevant. That is, MM's testimony had a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. MRE 401. To be relevant, evidence need only have a tendency to make the existence of *any fact that is of consequence* more or less probable. Here, MM's testimony regarding the custody dispute provided a conflicting portrayal of defendant after the victim's death, including the very next day. MM testified that defendant was actively preventing JS, as well as defendant's other daughters, from continuing to have a relationship with her after the victim's death. Defendant's daughters and friends, on the other hand, testified that defendant was shocked and emotional about the victim's death, and MM's testimony certainly undermines that theory. See, e.g., *People v Hoskins*, 403 Mich 95, 100; 267 NW2d 417 (1978) ("Because of the absence of direct evidence, the prosecutor

_____

[5] Notably, despite claiming that the testimony at issue portrayed defendant "as an evil person," defendant does *not* argue that the testimony at issue constituted improper character evidence. See MRE 404(a) ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith . . . ."). Indeed, she does not mention the phrases "character evidence" or MRE 404 in her argument in this regard. Because a complex analysis is required when determining whether character evidence of a defendant or a victim is admissible in a case where a defendant raises a self-defense theory in response to a charge of first-degree murder, see, e.g., *People v Harris*, 458 Mich 310, 314-321; 583 NW2d 680 (1998), it is not this Court's role to create such an argument for her.

in the instant case was forced to use circumstantial evidence in his attempt to prove that the defendant had the requisite state of mind at the time of the shooting to support a conviction of second-degree murder."). Furthermore, MM's testimony in this regard likely reflected on defendant's and defendant's daughters' testimony that the victim was an angry drunk that she was scared of, which the prosecution contends supports a finding that defendant influenced JS's and her other daughters' statements or trial testimony. See, e.g., *Schaw*, 288 Mich App at 237 (providing that a defendant's efforts to influence a witness were relevant, and thus admissible, because they "showed consciousness of guilt"). We therefore conclude that the trial court's conclusion that this testimony was relevant did not fall outside the range of reasonable outcomes.

Similarly, we are also of the view that MM's testimony was not unfairly prejudicial. That is, we see no reason why her testimony would have been given undue weight by the jury. *Feezel*, 486 Mich at 198. First, it is important to keep in mind that this testimony, which had a tendency to impact whether the jury believed defendant's daughters' testimony and reflected defendant's state of mind shortly after the victim was killed, was a brief portion of one witness's testimony during six days of testimony over an eight-day trial. Furthermore, defendant's conclusory claim that it portrayed her "as an evil person" is simply not supported by the record. In fact, if one were to assume that defendant was acting in self-defense as she claimed, her desire to prevent the biological child of the victim, i.e., the person she claimed was trying to kill or injure her, from continuing to have relationships with her children may have actually supported her defense. In our view, any prejudicial effect from the fact that the jury might have viewed defendant negatively because of how she handled JS's custody after the victim died is minimal at best when compared to the probative value that this testimony had on several witnesses' biases and defendant's mindset shortly after the victim was killed. Additionally, as alluded to above, defendant does not make any argument with respect to whether MM's testimony impermissibly reflected on her character. We therefore conclude that the trial court's conclusion that this testimony was not unfairly prejudicial did not fall outside the range of reasonable outcomes.

Relatedly, defendant briefly argues on appeal that her trial counsel's failure to object to Detective Schuette's and MM's testimony as described above constituted ineffective assistance of counsel. "The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

> Both the Michigan and the United States Constitutions require that a criminal defendant enjoy the assistance of counsel for his or her defense. Const 1963, art 1, § 20; US Const, Am VI. In order to obtain a new trial, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. [*People v* ]*Armstrong*, 490 Mich [281,] 290[; 806 NW2d 676 (2011)]; see, also, *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994) (adopting the federal constitutional standard for an ineffective-assistance-of-counsel claim as set forth in *Strickland*[ *v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984)]). [*Id*. at 51-52.]

-13-

Importantly, an attorney's "[f]ail[ure] to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). The arguments made by defendant with respect to her ineffective-assistance-of-counsel claim rely entirely on her positions as described above, all of which we ultimately concluded were meritless. Consequently, an objection by trial counsel would have been meritless. *Id*. We therefore conclude that defendant's trial counsel's performance did not fall below an objective standard of reasonableness and was not outcome determinative. *Trakhtenberg*, 493 Mich at 51-52.

Next, defendant argues that the trial court abused its discretion by admitting evidence about a previous occasion in which she had stabbed the victim. Specifically, defendant argues that the fact that she stabbed the victim toward the beginning of their relationship, approximately 10 years before the instant stabbing, has no bearing on her intent at the time of the stabbing at issue in this case. She claims, in relevant part, as follows:

> The notion that Dawn developed a motive or intent to stab Greg when they first got together and waited over 10 years to effectuate the plan is absurd on its face. If Dawn intended to murder Greg, there were numerous opportunities given the repeated testimony of Greg's drinking and drug use.

Therefore, defendant asserts, this evidence had no tendency to prove or disprove whether she was acting in self-defense at the time and that, even if it did, that minimal probative value was substantially outweighed by the danger of unfair prejudice. We disagree.

As stated above, a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Steele*, 283 Mich App at 480. Additionally, evidence is admissible only if it is relevant, meaning that it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401; MRE 402. However, even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. In support of this argument, unlike the evidentiary argument discussed above, defendant does argue that MRE 404 precluded the admission of this evidence as improper character evidence. Specifically, MRE 404(a) generally prohibits the admission of character evidence for character purposes. Despite this general prohibition, character evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act . . . ." MRE 404(b)(1). "At its essence, MRE 404(b) is a rule of inclusion, allowing relevant other acts evidence as long as it is not being admitted solely to demonstrate criminal propensity." *People v Martzke*, 251 Mich App 282, 289; 651 NW2d 490 (2002); see also *Mardlin*, 487 Mich at 616 ("[T]he rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character.").

In this case, it is apparent that the prosecutor sought to admit evidence that defendant had previously stabbed the victim, not to demonstrate criminal propensity, *Martzke*, 251 Mich App at 289, but to disprove defendant's claim that her decision to stab the victim was emotional and

made in self-defense, i.e., to prove her intent, MRE 404(b)(1). According to one of the victim's friends, the victim had called him on several occasions asking for a ride from the home after having an argument with defendant. When the friend arrived, he would witness defendant threatening to stab the victim multiple times, e.g., "I'm going to stab your ass." Specifically, on one occasion, the friend testified, the victim "was bleeding and everything and he's like, 'you bitch, I can't believe you stabbed me.' " At this point, defendant's trial counsel objected, and the trial court sustained that objection and gave a curative instruction. However, after defendant's testimony, the trial court decided to allow questioning with respect to the previous stabbing based on the nature of defendant's testimony. This additional testimony included several witnesses recalling the victim's comment that defendant tried to kill him by stabbing him and Detective Schuette's testimony that medical records confirmed that the victim sustained injuries similar to that described by the victim at that time. Specifically, the prosecution argued, and the trial court decided, that rebuttal testimony about defendant's prior stabbing of the victim was admissible pursuant to MRE 404(b) because it reflected on defendant's motive or intent. We agree with this conclusion. Indeed, much like a victim's prior acts of violence, a defendant's prior acts of violence are also highly relevant as to whether a defendant was acting in self-defense. See, e.g., *People v Taylor*, 195 Mich App 57, 61; 489 NW2d 99 (1992). Contrary to defendant's argument on appeal, the prior stabbing had little, if anything, to do with defendant's intent and patience over the 10 years leading up to the murder. Rather, it undermined defendant's testimony that she had never threatened the victim.[6] Indeed, defendant's testimony portrayed herself as the victim of one-way physical violence for several months leading up to the stabbing.[7] Consequently, defendant's prior acts of violence, and especially her prior stabbing of the victim, are highly relevant when determining whether she was acting in self-defense when she stabbed the victim. *Id*. We therefore conclude that the trial court did not abuse its discretion by admitting evidence of defendant's prior stabbing of the victim.[8]

---

[6] In fact, defendant denied having "ever threatened Greg whatsoever with physical harm[.]" In our view, this express denial opened the door, so to speak, for rebuttal testimony regarding instances where defendant had threatened or actually committed physical violence against the victim. Stated simply, this rebuttal testimony addressed defendant's intent and credibility, not her character.

[7] With respect to the stabbing at issue in this case, defendant testified that the victim "lunged at" her and that she was "not sure what happened after that." According to defendant, after stabbing the victim, "he's standing there and he lifts his shirt and . . . we both kind of see the cut and he turns around and he goes in and sits down on the couch." Defendant testified that she eventually called 911 and performed CPR until law enforcement arrived. When asked why she would tell the police officers that the victim was stabbed outside the home, defendant claimed that she "didn't want him getting in trouble for fighting and arguing and drinking, because he was trying to get his license and he couldn't have anything to do with drinking and police or anything."

[8] It is also conceivable that evidence of the prior stabbing could have been admitted pursuant to MCL 768.27b(1), which provides, in relevant part, for the admission of "evidence of the defendant's commission of other acts of domestic violence . . . for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403" "in a criminal

Lastly, defendant argues that resentencing is required because the trial court unreasonably departed from the advisory minimum sentencing guidelines range. Defendant claims that the trial court's comments at sentencing "reflected the judge's personal opinion about the characters of Greg and Dawn, rather than facts that are capable of being evaluated and confirmed by an appellate court." In support of her argument, defendant points to some of the trial court's statements, such as "Mr. Stack had a lot of really great qualities and he had one major fatal flaw, that's that he stayed in a relationship with you," and asserts that such comments show that the trial court "was likely moved by the devastation to the [victim's] family" which resulted in a sentence that was not based on objective reasoning. She also argues that, especially in light of her lack of criminal history, "the long sentence does not appear to serve any of the objectives of incarceration." Stated simply, defendant argues that the trial court's sentence was not reasonably proportionate to the crime and the offender. We agree.

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." *People v Steanhouse*, ___ Mich ___, ___; ___ NW2d ___ (2017) (Docket Nos. 152671, 152849, 152871-152873, 152946-152948), slip op at 14. In *Steanhouse*, the Michigan Supreme Court clarified that "the relevant question for appellate courts reviewing a sentence for reasonableness" is "whether the trial court abused its discretion by violating the principle of proportionality[.]" *Id*. at ___, slip op at 14-15. The principle of proportionality is one in which

> "a judge helps to fulfill the overall legislative scheme of criminal punishment by taking care to assure that the sentences imposed across the discretionary range are proportionate to the seriousness of the matters that come before the court for sentencing. In making this assessment, the judge, of course, must take into account the nature of the offense and the background of the offender." [*Id.* at ___, slip op at 15, quoting *People v Milbourn*, 435 Mich 630, 651; 461 NW2d 1 (1990).]

Under this principle, " 'the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines recommended range.' " *Id*. at ___, slip op at 15, quoting *Milbourn*, 435 Mich at 661. Part of the *Steanhouse* Court's reasoning for adopting the "principle-of-proportionality test" for reviewing a sentence for reasonableness was "its history in our jurisprudence." *Id*. at ___, slip op at 15. As such, our Supreme Court noted that, although its opinion in *Lockridge* corrected a constitutional flaw in the sentencing guidelines by making them fully advisory,

---

action in which the defendant is accused of an offense involving domestic violence[.]" One might argue that the 10-year limitation on this type of evidence prohibits the admission of the prior stabbing in this case; however, a similar argument could be made that the admission of the prior stabbing would serve the "interest of justice." See MCL 768.27b(4). In any event, because we agree with the trial court's decision with respect to MRE 404, our discussion in this regard is largely irrelevant.

nothing else in [that] opinion indicated we were jettisoning any of our previous sentencing jurisprudence outside the Sixth Amendment context. Moreover, none of the constitutional principles announced in *Booker* or its progeny compels us to depart from our longstanding practices applicable to sentencing. Since we need not reconstruct the house, we reaffirm the proportionality principle adopted in *Milbourn* and reaffirmed in [*People v. Babcock*, 469 Mich 247, 666 NW2d 231 (2003)] and [*People v Smith*, 82 Mich 292, 754 NW2d 284 (2008)]. [*Id*. at ___, slip op at 16.]

However, to the extent that dicta from our Supreme Court's prior opinions was "inconsistent with the United States Supreme Court's prohibition on presumptions of unreasonableness for out-of-guidelines sentences," it "disavow[ed] those dicta." *Id*. at ___, slip op at 18, citing *Gall v United States*, 552 US 38, 51; 128 S Ct 586; 169 L Ed 2d 445 (2007).

In this case, defendant was sentenced after *Lockridge* was issued, and the trial court expressly recognized that minimum sentencing guidelines ranges were now advisory. Consequently, it is apparent that the trial court was aware that its upward departure sentence would be reviewed for reasonableness on appeal. To begin the sentencing hearing, the trial court acknowledged that the applicable minimum sentencing guidelines range was 12 to 20 years. The prosecutor requested, in relevant part, that "the court exceed the guidelines significantly" and "sentence Ms. Dixon-Bey at a minimum, on the low end, to 30 years." The trial court, apparently agreeing with the prosecutor's argument, sentenced defendant to a minimum sentence of 35 years. The trial court reasoned as follows:

All right, well the court sat through this trial, for several weeks I listened to a lot of testimony and I've learned that few people in this business are perfect. And Mr. Stack had a lot of really great qualities and he had one major fatal flaw, that's that he stayed in a relationship with you. And I -- I -- I don't buy your -- your theory that this was just some kind of domestic situation and you struck out at him in some type of vulnerability. In fact, I think some -- some -- some facts that were well established during the trial are significant and that's the -- first, is that you stabbed him not [once] but twice in the heart.

Mr. Carter,[sic] might've -- oh, you know, maybe Dr. Ortiz-Reyes, you know, cut that when he was doing the autopsy. That -- that wasn't-- there was a second stab wound and it was directly to the heart. One and one half years before this even occurred you slashed Mr. Stack, you know, such that he had to have reconstructive surgery on his hand. So, this wasn't the first time there was a domestic act of violence with you involving a knife with the victim. In fact, you told Mr. Gove that all I have to do is stick him in the chest and then claim self-defense. That was a statement that you made before the alleged time when he was -- Mr. Stack was stabbed twice in -- in the heart.

And then, on -- on -- on the night in question we know the murder weaponed [sic] vanished. It was never found, never able to be processed by the police.

-17-

So, you had the presence of mind to do that. You had the presence of mind to go ahead and try to minimize your role and then try to turn the focus, you know, back on Mr. Stack as being the cause. Well, today the focus is about you. An intent can be determined by what you did, what you said, both before, during and after the crime. And, frankly, you plunged that knife into Mr. Stack's heart twice and you brutally murdered him in cold blood. And for that by the power vested in me in the State -- by the State of Michigan you're to serve thirty-five (35) years to seventy (70) years in the Michigan Department of Corrections, five hundred dollars ($500.00) in court costs, three hundred and seventy-five dollars ($375.00) in fines, a hundred and thirty dollars ($130.00) to the Crime Victims['] Rights Fund, sixty-eight dollars ($68.00) in State court costs, three hundred and fifty dollars ($350.00) in attorney's fees, sixty dollars ($60.00) in the DNA fee.

You know, with you married to another man in prison I'm just amazed he ever even stayed with you in the -- in a relationship. And -- and by the way, I did consider the sentencing guidelines which were 12 years to 20 years but I considered that the additional level of depraved heart and murder and the cold calculated nature of you brutally stabbing him twice in the heart and letting him bleed to death and die in this matter. So, the court believes my sentence is within the range. The guidelines are only advisory so you will serve that time. You'll be an old woman before you get out of prison.

It is our view that the 15-year upward departure was unreasonable and that, based on the record before us, the trial court abused its discretion by violating the principle of proportionality. When our Supreme Court adopted the principle of proportionality in *Milbourn*, it noted that it was doing so, in part, to "effectively combat unjustified disparity" in sentencing. *Milbourn*, 435 Mich at 647. As such, "[o]ne of the purposes of the proportionality requirement is to minimize idiosyncrasies." *Smith*, 82 Mich at 311. The *Milbourn* Court pointed to the sentencing guidelines as an aid to accomplish the purposes of proportionality, noting that they were "a useful tool in carrying out the legislative scheme of properly grading the seriousness and harmfulness of a given crime and given offender within the legislatively authorized punishments." *Milbourn*, 435 Mich at 657-658. In *Smith*, our Supreme Court reiterated that the sentencing guidelines "provide[] objective factual guideposts that can assist sentencing courts in ensuring that the offenders with similar offense and offender characteristics receive substantially similar sentences." *Smith*, 482 Mich at 309 (citation and quotation marks omitted).

More recently in *Steanhouse*, our Supreme Court noted that the Legislature had incorporated the principle of proportionality into the legislative sentencing guidelines. *Steanhouse*, ___ Mich at ___, slip op at 15, citing *Babcock*, 469 Mich 247. In the same opinion, our Supreme Court repeated its "directive from *Lockridge* that the guidelines 'remain a highly relevant consideration in a trial court's exercise of sentencing discretion' that trial courts 'must consult' and 'take . . . into account when sentencing.' " *Steanhouse*, ___ Mich at ___; slip op at 18, quoting *Lockridge*, 498 Mich at 391 (alterations in original). Because the guidelines embody the principle of proportionality and trial courts must consult them when sentencing, it follows that they continue to serve as a "useful tool" or "guideposts" for effectively combating disparity in sentencing. Therefore, relevant factors for determining whether a departure sentence is more proportionate than a sentence within the guidelines range continue to include (1) whether the

-18-

guidelines accurately reflect the seriousness of the crime, *People v Houston*, 448 Mich 312, 321-322, 532 NW2d 508 (1995), see also *Milbourn*, 435 Mich at 657, (2) factors not considered by the guidelines, *Houston*, 448 Mich at 322-324, see also *Milbourn*, 435 Mich at 660, and (3) factors considered by the guidelines but given inadequate weight, *Houston*, 448 Mich at 324-325, see also *Milbourn*, 435 Mich at 660 n 27.[9] When making this determination and sentencing a defendant, a trial court must " 'justify the sentence imposed in order to facilitate appellate review,' " *Steanhouse* ___ Mich at ___, slip op at 14, quoting *Lockridge*, 498 Mich at 392, which "includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been," *Smith*, 482 Mich at 311.

In this case, the trial court did not adequately explain why a sentence of 35 years was more proportionate than a different sentence within the guidelines would have been. Defendant's prior record variable (PRV) score was zero. She had a number of very old misdemeanors, but they were all nonviolent. Without a criminal history, the trial court had no basis to conclude that defendant was a "recidivist . . . criminal" that deserved a "greater . . . punishment" than that contemplated by the guidelines. *Id*. at 305. The trial court offered no other explanation as to why defendant's background may warrant a departure sentence. Thus, on the record before us, nothing about defendant's background supports that a departure sentence was more proportionate than a sentence within the guidelines. See *Steanhouse*, ___ Mich at ___, slip op at 15 (stating that a trial court must take into account the nature of the offense and the background of the offender when sentencing a defendant).

We now turn to the nature of defendant's offense. See *id*. Of the various factors referenced by the trial court, none of them provided reasonable grounds for a departure.[10] In

_____

[9] Other factors listed by this Court in *People v Steanhouse*, 313 Mich App 1, 46; 880 NW2d 297 (2015), rev'd in part on other grounds by *Steanhouse* ___ Mich ___ (2017), include "the defendant's misconduct while in custody, *Houston*, 448 Mich at 323, the defendant's expressions of remorse, *id*., and the defendant's potential for rehabilitation, *id*."

[10] We note that, while second-degree murder is a serious crime, the trial court never indicated that it believed that the guidelines inadequately reflected this seriousness. For instance, in *Houston*, 448 Mich at 321, the trial court stated,

> We have seen what I find to be ridiculously low guidelines in the offense of Criminal Sexual Conduct in the First Degree, just in general.

The Michigan Supreme Court stated that "[t]he observation [was] well taken" and they agreed "with the trial judge's conclusion that the recommended range [was] too low." *Id*. at 321-322. The *Houston* Court concluded, "Unless there is some basis for deciding what range would have been appropriate, we cannot reliably conclude that the sentence was disproportionate." *Id*. at 322. In contrast to *Houston*, the trial court in this case did not express a belief that the sentencing guidelines inadequately reflected the seriousness of second-degree murder. Therefore, we cannot conclude, on that basis, that the recommended sentence was less proportionate than the trial court's departure sentence. See *Smith*, 482 Mich at 311 n 42 (noting

fact, most, if not all, of the factors referenced by the trial court to support its departure sentence were contemplated by at least one offense variable (OV). The trial court emphasized the fact that defendant stabbed the victim twice in the chest. However, defendant's aggravated use of a lethal weapon is contemplated in the scoring of OV 1 (aggravated use of weapon), MCL 777.31, and OV 2 (lethal potential of weapon possessed or used), MCL 777.32. The trial court offered no rationale as to why that scoring was insufficient to reflect the nature of the stabbing. The trial court also pointed to the impact of the victim's death on his family, but OV 5 (psychological injury to member of victim's family), MCL 777.35, was scored to reflect that impact. Again, the trial court failed to offer any explanation as to why that scoring was insufficient. Further, the trial court's reliance on the fact that defendant apparently failed to disclose the location of the murder weapon would ordinarily trigger the application of OV 19 (interfering with the administration of justice), MCL 777.49, not an upward departure. The trial court also referred to the "cold-blooded" nature of the crime, yet we find it interesting that the trial court and parties apparently agreed that OV 7 (aggravated physical abuse), MCL 777.37, which relates to brutality or similarly egregious conduct, should not be scored based on the facts and circumstances of this case.

The trial court's reference to the "cold-blooded" nature of the crime may have been based on its belief that the killing was premeditated, which it also emphasized was part of the basis for its sentence. Generally, OV 6 (offender's intent to kill or injure another individual), MCL 777.36, can be scored to reflect an offender's intent and does not warrant an upward departure. However, pursuant to MCL 777.36(2)(a), a sentencing court must score OV 6 "consistent with a jury verdict unless the judge has information that was not presented to the jury." As a result, a sentencing court may be constrained under the guidelines from scoring OV 6 as high as it otherwise would have.

In this case, defendant was charged with first-degree murder, MCL 750.316, but the jury convicted her of second-degree murder, MCL 750.317. Although a jury may find premeditation when convicting an offender of first-degree murder, it is not required to find premeditation for second-degree murder. See *People v Hoffmeister*, 394 Mich 155, 158; 229 NW2d 305 (1975). Thus, on the basis of defendant's conviction of second-degree murder in this case, the trial court was constrained by MCL 777.36(2)(a) from scoring OV 6 to reflect a premeditated intent absent "information that was not presented to the jury." There is no indication on the record that the trial court had any information that was not presented to the jury, yet it nonetheless concluded that defendant acted with premeditation. The Legislature expressly gave trial courts an opportunity to find a premeditated intent for crimes to which such an intent does not necessarily attach. Absent the legislatively prescribed condition necessary to trigger that ability, we are highly skeptical of a trial court's decision to sentence a defendant convicted of second-degree murder as though the murder were premeditated. See *Steanhouse*, ___ Mich at ___, slip op at 15, quoting *Milbourn*, 435 Mich at 651 (noting that the principle of proportionality is intended " 'to fulfill the overall legislative scheme of criminal punishment' "). Moreover, even were the trial court to have scored this variable at 50 points, reflecting a premeditated intent, rather than as it did at 25 points, reflecting an unpremeditated intent, MCL 777.36, it would have increased

that the Legislature likely "did not overlook the basic fact" that certain crimes were heinous "when establishing sentencing guidelines for" those crimes).

-20-

defendant's overall OV score from 70 points to 95 points, leaving her recommended minimum sentence range unchanged, MCL 777.61. Thus, even if the trial court believed that this variable was given inadequate weight and should have been scored to reflect a premeditated intent, it does not support that a departure sentence was more proportionate.

Other factors relied upon by the trial court were not unique to defendant or otherwise relevant to a proportionality determination. The trial court highlighted the victim's standing in the community and defendant's attempts to minimize her role in the stabbing. Neither factor is, in our view, unique to defendant's crime, nor supported by the record. The trial court also referenced defendant's marriage with a man that was in prison during her relationship with the victim. Although an offender's relationship to the victim may be a sentencing factor that is not included in the guidelines, see *Milbourn*, 435 Mich at 660, defendant's relationship with the victim was that of a long-term girlfriend. There is nothing on the record to indicate that defendant's marriage to a different man impacted her relationship with the victim, and we cannot supplement the trial court's reasoning where it failed to give an explanation. See *Smith*, 482 Mich at 304 ("Similarly, if it is unclear why the trial court made a particular departure, an appellate court cannot substitute its own judgment about why the departure was justified."). Accordingly, while we do not seek to minimize the victim's death, we cannot conclude on the record before us that the trial court's 15-year upward departure sentence was more reasonable and proportionate than a sentence within the recommended guidelines range would have been. See *Smith*, 482 Mich at 305-306 (stating that a trial court should explain the extent of a departure); see *Steanhouse*, ___ Mich at ___, slip op at 17, quoting *Gall*, 522 US at 47 (noting that appellate courts may consider the extent to which a sentence deviates from the guidelines).

In urging the opposite conclusion, the dissent articulates the reasons given by the trial court for its departure sentence and then states,

> Under the applicable abuse of discretion standard, given the level of deference that we afford to trial judges because of their greater familiarity with the facts and experience in sentencing, I cannot find on the record before us that the trial court's sentence was not a "principled" outcome.

However, reliance solely on a trial court's familiarity with the facts of a case and its experience in sentencing cannot "effectively combat unjustified disparity" in sentencing because it construes sentencing review "so narrowly as to avoid dealing with disparity altogether," especially in this case. *Milbourn*, 435 Mich at 647. The *Milbourn* Court expressly recognized that a proportionality determination "becomes considerably more difficult" where, like in the case before us, "the Legislature has set no minimum or has prescribed a maximum of a lengthy term of years or life." *Id*. at 654. To deal with this difficulty, the *Milbourn* Court directed courts to consider the sentencing guidelines because they offered "the best 'barometer' of where on the continuum from the least to the most threatening circumstances a given case falls." *Id*. at 656. Following *Lockridge* and *Steanhouse*, trial courts are still required to consult the now advisory guidelines and take them into account when sentencing. *Steanhouse*, ___ Mich at ___; slip op at 18. Yet despite the fact that this case embodies the difficult proportionality determination described in *Milbourn*, the dissent indicates that it would affirm without reference to the sentencing guidelines.

In large part, the dissent's reluctance to refer to the sentencing guidelines appears based on the *Steanhouse* Court's directive that proportionality in Michigan be measured based on the seriousness of the offense rather than by the degree to which the sentence deviates from the guidelines. We of course agree that *Steanhouse* directs that proportionality in Michigan be based upon the seriousness of the offense and not a deviation from the guidelines, but we disagree that *Steanhouse* encourages appellate courts to determine proportionality in a void without consideration of the sentencing guidelines. *Steanhouse* generally reaffirmed our Supreme Court's prior jurisprudence regarding the principle of proportionality, implicitly condoning *consideration* of the sentencing guidelines in a proportionality determination, and it only disavowed its earlier opinions to the extent that they indicated in dicta that there was a *presumption* of disproportionality when a sentence departed from the guidelines. More explicitly, the *Steanhouse* Court quoted *Gall* for the proposition that " 'appellate courts may . . . take the degree of variance into account and consider the extent of a deviation from the Guidelines.' " *Id*. at ___; slip op at 17, quoting *Gall*, 522 US at 47. Accordingly, we read *Steanhouse* as directing appellate courts to use the sentencing guidelines as an aid when doing so assists in determining whether a sentence is proportionate. Because the range of sentences in this case was so large, up to life imprisonment, we believe that consideration of the guidelines was useful in determining the proportionality of the sentence.[11]

Accordingly, we affirm defendant's conviction, vacate defendant's sentence, and remand this matter for resentencing consistent with this opinion. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Joel P. Hoekstra

---

[11] To the extent that the dissent does discuss the sentencing guidelines, it reasons that, had the trial court scored OV 6 at 50 points rather than 25 points and OV 19 at 10 points rather than 0 points, then defendant's OV score would have been over the maximum contemplated by the guidelines thereby justifying the trial court's sentence. However, particularly with respect to OV 19, the fact that the trial court *could have* scored OV 19 but chose not to tends to support that the trial court did not consult the guidelines and take them into account when sentencing, *Steanhouse*, ___ Mich at ___, which supports that a departure sentence was not reasonable. It also bears noting that in appellate reviews of sentences generally, appellate courts should avoid supplementing or otherwise justifying the trial court's otherwise insufficient reasoning with reasoning of its own. See *Smith*, 482 Mich at 304.