# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANDREW ERIC LINDAHL,

        Defendant-Appellant.

UNPUBLISHED
July 17, 2018

No. 339812
Alpena Circuit Court
LC No. 17-007686-FH

Before: RONAYNE KRAUSE, P.J., and GLEICHER and LETICA, JJ.

PER CURIAM.

Defendant pleaded guilty to one count each of purchasing or possessing pseudoephedrine to manufacture methamphetamine and conspiracy to operate or maintain a methamphetamine laboratory, in exchange for the dismissal of six other criminal charges and sentencing as a third, rather than fourth, habitual offender. The prosecutor agreed not to seek a minimum sentence above the top of defendant's recommended minimum sentencing guidelines range—34 months. The trial court, however, sentenced defendant above the guidelines to 3 to 10 years' imprisonment for his purchase/possession conviction and 4 to 20 years' imprisonment for conspiracy. Defendant contends that these sentences are disproportionate. We affirm.

## I. BACKGROUND

Defendant has an extensive criminal record, with 13 prior felony convictions and 10 prior misdemeanor convictions. In 2013, defendant was placed on parole in Arizona, and was permitted to move to Alpena, Michigan. From October 2016 to January 2017, defendant conspired with Andrew Brilinski to produce meth. Brilinski manufactured the drug and defendant purchased and provided the main ingredient—ephedrine or pseudoephedrine found in decongestants. Given government monitoring of these medications, defendant was only able to purchase so much before he was cut off. He then convinced three other people to buy the medication for him with his credit card. Defendant and Brilinski were apparently not very discrete as their crimes were quickly discovered and they were arrested on January 11, 2017.

As noted, defendant pleaded guilty to two charges: purchasing or possessing meth and conspiracy to run a meth lab. The Department of Corrections prepared a sentencing information report and scored defendant's prior record and offense variables. The DOC scored no OVs, leaving defendant in OV Level I. Given defendant's extensive criminal history, however, he received a total PRV score of 150, placing him in PRV Level F. This included a score of 75

points, the highest available under PRV 1, representing three or more prior high severity felony convictions. MCL 777.51(1)(a). Defendant was assessed the highest number of points allowed under PRV 2, 30, reflecting four or more low severity felony convictions. MCL 777.52(1)(a). Defendant received a lower score for PRV 4, only 5 points, given his two low severity juvenile adjudications. MCL 777.54(1)(d). But he again received the highest number of points possible—20—for PRV 5, for having seven or more misdemeanor convictions or juvenile adjudications. MCL 777.55(1)(a). The DOC scored 10 points for PRV 6, as defendant was on parole at the time of his offense. MCL 777.56(1)(c). Finally, defendant was assessed 10 points for PRV 7, for one concurrent felony conviction. MCL 777.57(1)(b).

Before imposing sentence, the court gave a lengthy explanation on the record:

Well, Mr. Lindahl, I've reviewed the Presentence Report. You're 44 years of age, have 13 prior felonies, 10 prior misdemeanor convictions . . . . This involves you on multiple occasions providing pseudoephedrine so that Mr. Brilinski can cook meth and create meth and have meth available in this community. Your attorney points out that Mr. Brilinski received a five-year sentence, and he was the cook, and you were only the supplier. I'm not sure there's a big difference there. Mr. Brilinski is your friend. You're hanging with him. You know exactly what he's doing. You've experienced methamphetamine in Arizona. And in order for him to do this, he needs the pseudoephedrine. And you very willingly agreed on multiple occasions - - I think you said you furnished about 10 boxes of pseudoephedrine for him to make methamphetamine so it can be available in Alpena. And this is one of the most destructive drugs there is: it's just a horrible drug. It's so addictive. It's so damaging to people. And it doesn't just stop with people using drugs. As your record reflects, people are out there committing armed robberies. They're stealing. They're committing fraud to get the money to get these drugs because the drugs own them. And your attorney's right, you got a rough start. That's not your fault. That wasn't your making that your mom was injecting drugs, but she was injecting drugs because they're available, and you're making those same drugs available in this community. So, the next generation that comes up who has the same problems you have because their parents were injecting drugs, to a degree, that's on you. It's you, and people doing what you're doing, that make that a possibility in this community. And if you are familiar with meth, you know it started on the west coast, and it's coming this way. And it's showing up more and more in Michigan now, and it's very destructive. And so you're familiar with it in Arizona, you make several comments to police how it's better in Arizona, stronger meth, whatever, and so now you're part of the group that's bringing it to the east. And it's just a scourge. It's just an epidemic. And whether it was fair that your mom did it, it clearly wasn't. And I'm sympathetic to that. . . . [I]t's a tragedy that you had to endure some of the things you had to, but I can't change that. You're 44 years old now. I can't let you continue to damage our community because you had a terrible break in your life, it has to be held to the same standard. And I've reviewed all these letters, and, clearly, you keep a foot in both worlds. You show two sides of yourself. You show one side to these folks that are supporting you, and you can be a very considerate, giving, loving person. On the other hand, you're hanging

out with Brilinski and all this crowd. You know what they're into. You've had all this community support, all this family support, and yet you chose to go back to that world, and here we are. So the fact that you're getting counseling now and have been sober now for four months, or whatever it is, I appreciate that. I've sentenced enough people that - - and I've seen them before and after, and when they're facing sentencing, and you have that type of attention, they do amazing things. And, unfortunately, they're not doing those same things after they're done with their sentence. So I certainly wish you well, and I hope you can get a handle on this, but that's up to you. And, you know, you had so much support here, you could have got all the treatment in the world. So it's not that you've been denied access to treatment, it's out there, it's available. With all the support you had, you certainly could have availed yourself of treatment before this happened. So I - - it's - - the sentencing, it's just about you, it's about deterrence, and it's about fairness to the community, and it's about protecting the community. And if I could do anything to keep methamphetamines out of Northern Michigan, I'd do it. I don't know what that is, but it's a terribly destructive drug, and it's starting to appear in our communities in Northern Michigan, and it - - it's a disaster.

So, considering all these things, as to Count 1, the guideline range is 9 to 34; as to Count 2, it's 10 to 34. As to Count 1, I'd sentence you to a term of not less than 36 months, no more than 10 years. . . . As to Count 2, the conspiracy to maintain a drug lab, habitual offender third, the guideline range is 10 to 34. I would sentence you to the Michigan Department of Corrections for not less than 48 months, no more than 20 years. This is 12 months outside the guideline range. I understand the guidelines are advisory to give a ballpark, but when I consider the prior criminal record and the number of times that you're actively assisting in the manufacture of methamphetamines in this community, and the prior record, and for the protection of the public, its seems like 48 months is probably as low as I can go. And it is as low as I can go. So it would be 48 months to 20 years, credit for 102 days served.

The court's sentence for the purchase/possession conviction was a three-month departure and a 14-month departure for the conspiracy conviction. Defendant now appeals those sentences.

## II. LEGAL STANDARDS

We review departure sentences for reasonableness, *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015), and review a lower court's determination that a particular sentence is reasonable for an abuse of discretion. *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). In determining whether a trial court abused its discretion by unreasonably departing from the sentencing guidelines, we review whether the court conformed to the principle of proportionality set forth in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990). *Steanhouse*, 500 Mich at 476-477.

To adhere to the principle of proportionality,

> "a judge helps to fulfill the overall legislative scheme of criminal punishment by taking care to assure that the sentences imposed across the discretionary range are proportionate to the seriousness of the matters that come before the court for sentencing. In making this assessment, the judge, of course, must take into account the nature of the offense and the background of the offender."

> Under this principle, " 'the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines recommended range.' " [*People v Dixon-Bey*, 321 Mich App 490, 521; 909 NW2d 458 (2017), oral argument gtd on the application 501 Mich ___ (2018), quoting *Steanhouse*, 500 Mich at 472, quoting *Milbourn*, 435 Mich at 651, 661.]

In *Milbourn*, 435 Mich at 635, the Supreme Court held that the sentencing guidelines were designed with the "principle of proportionality" in mind, to impose punishment "relative [to the] seriousness and severity of individual criminal offenses." The Legislature already took into account the seriousness of the various criminal offenses and the danger imposed by recidivism in creating the guidelines and "intended more serious commissions of a given crime by persons with a history of criminal behavior to receive harsher sentences than relatively less serious breaches of the same penal statute by first-time offenders." *Id*. Judges departing from the guidelines must exercise their discretion "according to the same principle of proportionality," *id*. at 635-636, and impose a sentence that is proportionate to the seriousness of the particular offense and offender. *Steanhouse*, 500 Mich at 474. To this end, trial courts may depart "when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Milbourn*, 435 Mich at 657. The guidelines are "a useful tool," but departure sentences are "appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing." *Id*. at 657-658.

In application, the *Milbourn* Court found that "departures from the guidelines, unsupported by reasons not adequately reflected in the guidelines variables, should . . . alert the appellate court to the possibility of a misclassification of the seriousness of a given crime by a given offender and a misuse of the . . . sentencing scheme." *Id*. at 659. The Court explained:

> Where there is a departure from the sentencing guidelines, an appellate court's first inquiry should be whether the case involves circumstances *that are not adequately embodied within the variables used to score the guidelines*. A departure from the recommended range in the absence of factors not adequately reflected in the guidelines should alert the appellate court to the possibility that the trial court has violated the principle of proportionality and thus abused its sentencing discretion. Even where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality. . . . [*Milbourn*, 435 Mich at 659-660 (emphasis added).]

In *People v Smith*, 482 Mich 292; 754 NW2d 284 (2008), the Supreme Court described a practical application of the principle of proportionality. The *Smith* Court required a trial court to rationalize and articulate why the specific departure sentence imposed was proportionate to the offense and the offender. *Id*. The Court explained that a departure cannot be based "on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight." *Id*. at 300, quoting MCL 769.34(3)(b).

Although dealing with statutory language in MCL 769.34 that is no longer applicable due to *Lockridge*, 498 Mich at 391 (regarding substitution of the words "may" for "shall"), the *Smith* Court's methodology to effectuate the principle of proportionality remains relevant. Addressing appellate review of departure sentences, the *Smith* Court stated:

> Appellate courts are obliged to review the trial court's determination that a . . . reason exists for departure. Accordingly, the trial court's justification "must be sufficient to allow for effective appellate review." In [*People v Babcock*, 469 Mich 247, 258-259; 666 NW2d 231 (2003)], this Court explained that an appellate court cannot conclude that a particular . . . reason for departure existed when the trial court failed to articulate that reason. Similarly, if it is unclear why the trial court made a particular departure, an appellate court cannot substitute its own judgment about why the departure was justified. A sentence cannot be upheld when the connection between the reasons given for departure and the extent of the departure is unclear. When departing, the trial court must explain why the sentence imposed is more proportionate than a sentence within the guidelines recommendation would have been. [*Smith*, 482 Mich at 304 (citations omitted).]

Also identified as assisting appellate review of the proportionality of a departure sentence is "when a court explains the similarity between the facts justifying the departure and the facts describing a crime meriting the same sentence under the guidelines. A comparison of a defendant's characteristics and those of a hypothetical defendant whose recommended sentence is comparable to the departure sentence is a valuable exercise." *Id*. at 310. In this vein, a "potential means of offering . . . a justification [for a departure] is to place the specific facts of a defendant's crimes in the sentencing grid." *Id*. at 306. The Court reasoned that "reference to the grid can be helpful, because it provides objective factual guideposts that can assist sentencing courts to ensure that the offenders with similar offense and offender characteristics receive substantially similar sentences," *id*. at 309 (quotation marks and citation omitted), and thus "minimize idiosyncrasies" in sentencing. *Id*. at 311. However, courts are not required to "sentence defendants with mathematical certainty" and "precise words [are not] necessary . . . to justify a particular departure." *Id*.

A common thread in the line of sentencing cases both before and after *Lockridge* is that a court may not depart from the sentencing guidelines based on factors already taken into account under the guidelines except under specific circumstances. In determining whether the chosen departure sentence is more proportionate than a guidelines sentence, relevant considerations include: "(1) whether the guidelines accurately reflect the seriousness of the crime, . . . (2)

factors not considered by the guidelines, . . . and (3) factors considered by the guidelines but given inadequate weight." *Dixon-Bey*, 321 Mich App at 525 (citations omitted).

III. ANALYSIS

A. PRIOR RECORD

Defendant first contends that the trial court improperly cited his criminal history in departing upward from the recommended sentencing guidelines range as his history was already considered in scoring the PRVs. As noted, however, a court may consider factors that are already used when scoring the guidelines if they are given inadequate weight. Here, the PRVs stopped short of accounting for the numerous prior convictions in defendant's record.

Defendant had a total of 13 prior felony convictions and 10 prior misdemeanor convictions. PRV 1's highest score only takes into account three felonies, and PRV 2 four. The court could score defendant no higher under these variables for the six additional felonies he had been convicted of in the past. Indeed, defendant had nearly double the highest number of prior felony convictions that can be counted under the statute. And PRV 5 takes into account only seven prior misdemeanor convictions, three less than defendant had on his record. The Supreme Court specifically contemplated in *Milbourn*, 435 Mich at 657, that a defendant with an extensive criminal record may warrant a sentence outside the calculated guidelines range: "[A] sentencing judge could legitimately depart from the guidelines when confronted by the unlikely prospect of a one hundred-time repeat offender, since the guidelines do not take such extensive criminal records into account." More recently, this Court held in *People v Walden*, 319 Mich App 344, 354-355; 910 NW2d 142 (2017), that the trial court properly relied on the defendant's nine prior charged criminal offenses in imposing an upwardly departing sentence. Similarly here, the trial court acted well within its discretion in determining that a departure was warranted.

In a similar vein, defendant challenges the use of his prior record to increase his sentence when he was already given an enhanced sentence as a habitual offender. Again, however, defendant was only sentenced as a third habitual offender, not a 13th habitual offender. The limitations on the habitual offender statute do not account for such excess in repeat offenses.

Defendant suggests that he was treated unfairly because the court considered his last conviction, which actually occurred 13 years earlier, and thereby artificially inflated his PRVs. MCL 777.150(1) provides that when scoring PRVs 1 through 5, the court may "not use any conviction or juvenile adjudication that precedes a period of 10 or more years *between the discharge date* from a conviction or juvenile adjudication and the defendant's commission of the next offense resulting in a conviction or juvenile adjudication." (Emphasis added.) Defendant was released from prison for his last conviction in 2013 and was still on probation when he committed the current offenses. Accordingly, the court could rely on that offense in scoring the PRVs. As defendant had spent more than 20 years of his life in prison for his prior 13 felony and 10 misdemeanor convictions, there were no 10-year gaps in this record. The court properly applied the statute and defendant cannot claim "[dis]advantage" as a result.

## B. PROTECTION OF THE PUBLIC

Defendant further asserts that the trial court improperly departed upward from the sentencing guidelines to protect the public. The protection of the public is considered in scoring the OVs, defendant insists, and his crimes posed no danger to the public as reflected by his OV score of zero. Defendant further contends that the facts do not support that this meth production scheme affected the community as a whole; rather, the drugs were made and used by a small group of individuals.

The court essentially took judicial notice of the danger posed by meth manufacture itself and the meth epidemic that has scourged rural areas across America. The trial court spoke at length of the destructive qualities of meth, both to the individuals addicted to the substance and to the community at large. However, no particular victim was identified and defendant did not commit a direct act of violence, leaving the majority of the OVs inapplicable. There were insufficient record facts regarding the amount of narcotics involved to score OV 15, aggravated controlled substance offenses. See MCL 777.45. And the six charges dismissed as part of the plea negotiations did not necessarily occur within a 24-hour period, rendering OV 12 inapplicable. See MCL 777.42. Accordingly, the court correctly determined that the danger posed by defendant's current offenses was not adequately considered under the guidelines.

## C. ACTIVE ASSISTANCE

Defendant contends that the trial court erroneously determined that he "actively" assisted in the production of meth when deciding to depart upward from the guidelines. He recites a dictionary definition of "actively" as involving "positive action." However, defendant took positive action when he purposefully secured decongestants and brought them to Brilinski for the express purpose of making meth. Defendant may not have stirred the batter but he brought the key ingredient to the mixer. This argument is completely unavailing.

Defendant also asserts that the trial court erroneously accused him of having a role in moving the meth epidemic east from Arizona. At one point, the court stated, "and so now you're part of the group that's bringing it to the east." Put in context, the court was not accusing defendant of being a drug trafficker or of introducing a new drug into the Alpena area. Rather, the court took notice of the fact that the meth epidemic started out west and that defendant was familiar with the drug as he became an addict while living in Arizona. When given the opportunity at a fresh start in a new town, defendant found a new circle of friends that he could help make meth, repeating his cycle. Although inartfully worded, the court's comment was really just a different iteration of its concerns regarding defendant's extensive criminal past and the dangers posed to the community by meth production.

## D. MITIGATING FACTORS

Finally, defendant contends that there were several mitigating factors in this case, which actually warranted a more lenient sentence. Defendant asserts that his offenses were not actually dangerous to the community at large as he purchased and supplied pseudoephedrine and ephedrine products to Brilinski only to feed his own drug habit. His offenses were much less serious, defendant insists, than if he had been involved in a large-scale meth production scheme.

Defendant notes that he completed an inpatient drug rehabilitation program and continued outpatient treatment while he awaited sentencing. Defendant further describes that he is gainfully employed and has significant family support, which will only promote his further rehabilitation. Defendant expressed sincere remorse at sentencing and had fully cooperated with the police investigation, he posits.

Contrary to defendant's complaints, the court did take many of these factors into account. The court acknowledged defendant's belief that his role in the crime was minimal but disagreed. The court found defendant's recent rehabilitation efforts admirable, but too little too late considering his long history of addiction. And the court found defendant's relapse into drug production and use troubling given the extensive support and opportunities he had been given upon his move to Alpena.

Ultimately, the trial court adequately supported its assessment that the particular departure sentences were proportionate to the circumstances of defendant's crimes. Accordingly, defendant is not entitled to remand for resentencing.

We affirm.

/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Anica Letica