*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

AARON ANTWAUN ROBINSON,

      Defendant-Appellant.

UNPUBLISHED
January 19, 2023

No. 357885
Genesee Circuit Court
LC No. 11-029956-FC

Before: PATEL, P.J., and BORRELLO and SHAPIRO, JJ.

PER CURIAM.

Defendant was found guilty by a jury of first-degree home invasion, MCL 750.110a(2); safe-breaking, MCL 750.531; larceny of a firearm, MCL 750.357b; receiving and concealing a stolen firearm, MCL 750.535b; and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Following remand for resentencing on his home invasion and safe-breaking convictions, the trial court imposed consecutive sentences of 95 to 240 months' imprisonment for first-degree home invasion and 86 to 140 months' imprisonment for safe-breaking.[1] While it was not outside the range of reasonable and principled outcomes to impose discretionary consecutive sentences, we vacate defendant's home invasion and safe-breaking sentences and remand this case for resentencing because OV 1 was improperly scored. On remand, the trial court shall score OV 1 at 0 points because the jury acquitted defendant of all of the charges alleging that he possessed a firearm, and the facts do not establish that he possessed another type of weapon. See *People v Beck*, 504 Mich 605; 939 NW2d 213 (2019); see also *People v Jackson*, 509 Mich 981; 973 NW2d 617 (2022).

---

[1] Defendant's additional sentences of 13 to 60 months' imprisonment for larceny of a firearm, 2 to 10 years' imprisonment for receiving and concealing a stolen firearm, and two years' imprisonment for felony-firearm are not at issue in this appeal.

## I. FACTS

### A. OVERVIEW OF PROCEDURAL POSTURE

This is the third time that defendant's case has been before this Court. In defendant's first appeal, this Court vacated his sentences because the trial court failed to adequately justify its departure sentences for home invasion and safe-breaking. *People v Robinson*, unpublished per curiam opinion of the Court of Appeals, issued February 17, 2015 (Docket No. 319226) (*Robinson I*). On remand, the trial court reimposed the same sentences, defendant again appealed, and this Court affirmed, holding that defendant's departure sentence was reasonable and that the trial court did not rely on acquitted conduct. *People v Robinson*, unpublished per curiam opinion of the Court of Appeals, issued December 28, 2017 (Docket No. 335193) (*Robinson II*). Thereafter, defendant applied for leave to appeal in the Michigan Supreme Court. The Supreme Court vacated this Court's opinion and remanded the case for reconsideration. *People v Robinson*, 505 Mich 872 (2019). Once again, this Court affirmed defendant's sentences. *People v Robinson (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued May 14, 2020 (Docket No. 335193) (*Robinson III*). Defendant again applied for leave to appeal in the Supreme Court. This time, the Supreme Court reversed this Court's judgment and remanded the case to the trial court for resentencing, reasoning that the trial court had improperly considered acquitted conduct; the Court additionally directed the trial court to reconsider whether to impose discretionary consecutive sentences. *People v Robinson*, 507 Mich 852 (2021). Defendant now appeals the trial court's resentencing.

### B. FACTUAL BACKGROUND

In defendant's first appeal, this Court recounted the factual background surrounding the crimes as follows:

> In August 2011, the 77-year-old victim, former Genesee County sheriff's deputy Lonnie Thomas, Sr., was killed at 914 East Jamieson when he came home to a robbery in progress. There is no dispute that Ryan Deville, who was originally a co-defendant, fired the fatal shots. At issue during trial was defendant's participation and role during the events leading up to the victim's death. Defendant was originally charged with first-degree felony murder, second degree murder, carjacking, armed robbery, first-degree home invasion, safe breaking, larceny of a firearm, receiving and concealing a firearm, and felony-firearm.
>
> Friends of the victim were concerned when they could not reach the victim by phone. They went to his home and noticed that a truck was missing. Thinking that the victim was simply running errands, they waited for him to return. When the victim failed to return after a couple of hours, they called police. The victim was found dead on his couch. He had been shot multiple times. As the police were conducting the initial investigation, one of the victim's friends learned that the victim's truck was at a nearby convenience store. She alerted police, who arrested defendant.

An audiotape of defendant's first statement to Officer Terrence Coon was played for the jury. In it, defendant stated that Deville had picked him up in a blue Chevy Cobalt that Deville said belonged to his aunt. They drove around until the car broke down. Defendant suggested that they break into the victim's home. Defendant was familiar with the victim, having previously lived down the street from him. Deville crawled through a window at the victim's home and then let defendant in through the door. Neither of them was armed. Defendant and Deville found numerous jars of coins and guns. The two of them were in the victim's house when the victim returned. Defendant wanted to leave, but Deville fired a shot near defendant and threatened to kill him if he did not help. Defendant agreed and ducked into the kitchen; he heard three shots. They moved the victim's body to the couch in order to get him out of the way. They waited for the sun to go down before they loaded the victim's items into the victim's truck. Deville was worried about the body smelling, so they poured bleach on the victim and turned up the air conditioning. Deville covered the victim with a blanket. Defendant drove the pickup truck to Deville's friend's house, where they left several guns for safekeeping. After that, defendant dropped off Deville at his home and then proceeded to his girlfriend's grandmother's house. He tried to go back to "live my normal life" and "keep my mind off it" by going to a party and staying at a hotel room with his girlfriend.

Approximately a month later, defendant was interviewed by police a second time. Defendant told Sergeant Jeff Collins that he and Deville had talked about robbing the victim's home a couple of days before doing so. They began to monitor the victim's home and came up with a ruse to knock on the door and ask the victim if he needed his lawn mowed. The victim said that the lawn did not need to be mowed and that he was leaving shortly to go to the bank. At that time, defendant and Deville determined that they could enter the home through a window that had an air conditioner unit. They waited until the victim left and then entered the home. Defendant told Collins that Deville picked up a gun from a table and indicated that they were going to kill the victim when he returned. When defendant indicated that he was "not down with that," Deville fired a shot at him. When the victim arrived back home, defendant went to the kitchen area and heard three shots fired. He helped Deville move the victim's body to the couch and the two spent an hour in the house.

Defendant gave a third statement to police a full year after the crime was committed. Defendant told former Lieutenant David Dwyre that he lied about Deville threatening him. Defendant admitted that they planned the burglary, but there was never a plan to harm the victim. Dwyre suggested that defendant write a letter of apology to the prosecutor, which was admitted at trial.

* * *

Deville testified that it was defendant who drove the blue car. Deville testified that after the car broke down, defendant pointed out a white house and "said that that's the house we can get some money at." Deville was under the

impression that defendant's grandfather lived there. They "scoped" it out, but it appeared someone was there. They knocked on the front door and the victim came to the door. Defendant asked the victim if he could come and help them fix the car. The victim said that he would take a look, but that he had to go somewhere first. Deville and defendant decided to walk around the block and by the time they made it back, a vehicle was missing from the victim's driveway.

Deville testified that defendant went through the window and let Deville in through the back door. Once inside, defendant pointed to a gun on a table and handed it to Deville. When Deville grabbed it "it went off and shot the TV." Deville denied threatening defendant or intentionally firing the weapon at defendant. They were "putting everything together" when the victim walked in. Deville believed that the victim would be within his right to shoot him and defendant, so Deville grabbed a gun off of the bed and shot the victim several times.

Deville testified that they laid the victim on the couch so they would not have to walk over his body. He covered the victim with a blanket and defendant poured bleach on the victim because a dead man was certain to smell.

* * *

Defendant testified that they could see the victim's driveway from where the blue car was parked in a vacant lot on Jamieson. When they saw the victim leave, they approached the house. Deville climbed through an open window that had an air conditioning unit and let defendant in through the back door. Deville showed defendant a handgun he had found and revealed that he intended to kill the victim when he came home. Deville fired a shot into a TV that defendant was near and threatened to kill defendant if he tried to leave.

Defendant testified that he was scared and told Deville that he would help. When they saw the victim returning, Deville ordered defendant to run to the kitchen. Defendant heard the door open and then heard three successive gunshots. Defendant helped Deville move the victim to the couch. Deville placed a blanket over the victim. Deville later went back and poured bleach on the victim. [*Robinson I*, unpub op at 1-4.]

At defendant's most recent resentencing, the trial court opted not to impose departure sentences. Instead, the court explored whether a consecutive sentence was warranted. The court considered numerous factors including the severity of the crime, the treatment of the victim's body, defendant's leadership role, defendant's history, defendant's lack of remorse, defendant's age, and defendant's behavior in prison. The court ultimately decided that defendant's sentences for home invasion and safe-breaking would be served consecutively. This appeal followed.

## II. DISCUSSION

## A. CONSECUTIVE SENTENCE

Defendant argues that the trial court abused its discretion by imposing a consecutive sentence. We disagree.

"When a statute grants a trial court discretion to impose a consecutive sentence, that decision is reviewed for an abuse of discretion." *People v Baskerville*, 333 Mich App 276, 290; 963 NW2d 620 (2020). A trial court abuses its discretion by making a decision that is outside the range of reasonable and principled outcomes. *Id.*

"In Michigan, concurrent sentencing is the norm, and a consecutive sentence may be imposed only if specifically authorized by statute." *People v Ryan*, 295 Mich App 388, 401; 819 NW2d 55 (2012) (quotation marks and citation omitted). In this case, consecutive sentencing was authorized by MCL 750.110a(8), which provides that "[t]he court may order a term of imprisonment imposed for home invasion in the first degree to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." When imposing a consecutive sentence, the trial court must articulate its rationale in order to facilitate appellate review. *People v Norfleet*, 317 Mich App 649, 664-665; 897 NW2d 195 (2016) (*Norfleet I*). Because there is a "heavy presumption in favor of concurrent sentences," the trial court must clearly explain its reasons "for believing that the strong medicine of a consecutive sentence was appropriate" for the case at hand. *People v Norfleet (After Remand)*, 321 Mich App 68, 73; 908 NW2d 316 (2017) (*Norfleet II*).

First, defendant argues that the trial court's reasons for imposing a consecutive sentence involved factors that were already accounted for by the sentencing guidelines—predatory conduct, leadership role, and his guilty plea to a charge of second-degree home invasion arising from a similar transaction less than a month before this one. When a trial court departs from the sentencing guidelines, it must articulate factors that either were not accounted for by the guidelines or were given inadequate weight by the guidelines when it. *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017). But defendant has failed to identify any authority suggesting that this is also true in the context of a consecutive sentence. Accordingly, to the extent defendant argues that the court erred by relying on factors that were already considered in the sentencing guidelines as a basis for imposing a consecutive sentence, we conclude this argument is without merit.

The trial court articulated several particularized reasons in support of its decision to impose a consecutive sentence. First, the court noted the predatory nature of the crime. In particular, the court emphasized that defendant knew the victim and created a ruse to gain access to the victim's home. The court's findings pertaining to the predatory nature of defendant's conducts were supported by the record.

The court also considered that defendant demonstrated a callous disregard for the victim by pouring bleach on his corpse. Defendant argues that the consideration of this factor was a factual error because the court stated that "[t]his body was mutilated" and defendant maintains that there was no evidence that a "mutilation" occurred. Defendant supports this argument with

citations to authority governing the crime of mutilation of a human body. But it is clear from the context of the statement that the court was merely using the term colloquially. The court did not make a formal finding that defendant was guilty of the crime of mutilation.

The court next considered defendant's leadership role. The court found that the victim was defendant's neighbor and was the target of this crime as a result of his connection with defendant. This finding was supported by the record.

The court then considered that defendant had pleaded guilty to a charge of second-degree home invasion arising from a similar transaction less than a month before this one. Defendant does not dispute the court's summary of the facts giving rise to that conviction.

Additionally, the court considered what it perceived as a lack of remorse on the part of defendant. Defendant argues that the court improperly punished him for declining to admit guilt and that it decided "to spin his trial defenses as aggravators." This argument is not supported by the record. The court did not reference defendant's trial defenses. The court focused on a prior judge's finding that he lacked remorse as well as defendant's statements at the resentencing hearing. The court emphasized that defendant never said he was "sorry for what happened." Defendant could have apologized for his role in the break-in without admitting guilt. Nevertheless, there is nothing in the record suggesting that defendant's lack of remorse was a major consideration for the court in imposing a consecutive sentence.

The court also considered that defendant was no longer a juvenile when he committed the crime. Defendant argues that the court improperly considered defendant's youth as an aggravator instead of a mitigator. The court repeatedly acknowledged that defendant was young. But the court pointed out that defendant was no longer a child and that his youth was therefore not a significant mitigator.

Finally, the court considered that defendant had committed 39 misconducts over the course of his incarceration. Defendant does not dispute this finding. He simply argues that his overall institutional record is "relatively good" and that he was classified in the second lowest security class at the time of resentencing. We conclude that the court's finding was supported by the record

In conclusion, the trial court created a thorough and thoughtful record; in doing so, it articulated particularized reasons which demonstrated a reasonable belief that the strong medicine of consecutive sentencing was warranted.

## B. OV 1

Defendant argues that the trial court erred by assessing 25 points for OV 1. We agree.

Under the sentencing guidelines, a trial court's factual findings "are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Sours*, 315 Mich App 346, 348; 890 NW2d 401 (2016) (quotation marks and citation omitted). "A sentencing court may consider all record evidence before it when calculating the guidelines, including, but not limited to, the contents of a presentence investigation report, admissions made by a defendant during a plea proceeding, or testimony taken at a preliminary examination or trial." *People v Johnson*, 298

Mich App 128, 131; 826 NW2d 170 (2012) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. (quotation marks and citation omitted). "To preserve a sentencing issue for appeal, a defendant must raise the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in the court of appeals." *People v Anderson*, 322 Mich App 622, 634; 912 NW2d 607 (2018).

In this case, defendant did not object to the scoring of OV 1 in the trial court, and he also did not bring a motion for resentencing or remand. We review unpreserved arguments for plain error affecting substantial rights. *People v Seals*, 285 Mich App 1, 4; 776 NW2d 314 (2009). The defendant must show that error occurred, "the error was plain, i.e., clear or obvious," and that the plain error affected his or her substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To satisfy the third element, the defendant must show that the error "affected the outcome of the lower court proceedings." *Id*. Reversal is warranted "only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Allen*, 507 Mich 597, 614; 968 NW2d 532 (2021) (quotation marks and citations omitted).

Criminal defendants are entitled to a sentence that is based on accurate information and accurate scoring of the sentencing guidelines. *People v McGraw*, 484 Mich 120, 131; 771 NW2d 655 (2009). Sentencing courts must determine the applicable minimum sentence range under the sentencing guidelines and take such calculations into account when imposing a sentence; however, the guidelines are advisory only and not mandatory. *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015). A defendant is entitled to resentencing if there is a scoring error that alters the defendant's recommended minimum sentence range under the guidelines. *People v Francisco*, 474 Mich 82, 89; 711 NW2d 44 (2006).

OV 1 "is aggravated use of a weapon." MCL 777.31(1). It is appropriate to assess 25 points for OV 1 if "[a] firearm was discharged at or toward a human being or a victim was cut or stabbed with a knife or other cutting or stabbing weapon." MCL 777.31(1)(a). Defendant argues that, because only Deville used or fired a gun and because defendant was found not guilty of murder, armed robbery, and carjacking, assessing 25 points for OV 1 was an impermissible consideration of acquitted conduct.

In *Beck*, our Supreme Court held that "the use of acquitted conduct to sentence a defendant more harshly violates due process . . . ." The Court explained how the use of acquitted conduct is distinguishable from the use of uncharged conduct:

> When a jury has made no findings (as with uncharged conduct, for example), no constitutional impediment prevents a sentencing court from punishing the defendant as if he engaged in that conduct using a preponderance-of-the-evidence standard. But when a jury has specifically determined that the prosecution has not proven beyond a reasonable doubt that a defendant engaged in certain conduct, the defendant continues to be presumed innocent. To allow the trial court to use at sentencing an essential element of a greater offense as an aggravating factor, when

the presumption of innocence was not, at trial, overcome as to this element, is fundamentally inconsistent with the presumption of innocence itself. [*Beck*, 504 Mich at 626-627 (quotation marks and citation omitted).]

This Court provided guidance on the application of *Beck* in *People v Brown*, ___ Mich App ___; ___ NW2d ___ (2021) (Docket No. 352001); slip op at 1. Because courts have struggled with the implementation of the *Beck* majority's description of "acquitted conduct" as conduct that "has been formally charged and specifically adjudicated not guilty by a jury," this Court adopted a "rational-jury approach" that would focus "on what the parties actually disputed at trial." *Id.* at 5-6.

This approach moves away from prohibiting any and all facts and circumstances related to any element of the crime, and instead focuses on the key facts and circumstances that the parties argued about during the trial. This approach is similar to the "rational jury" standard used in the double-jeopardy context, which requires examining the record to determine the ground or grounds upon which a rational jury could have acquitted the defendant. Rather than focus on all of the conceivable grounds upon which a jury could have theoretically acquitted the defendant—even those grounds, for example, that were conceded by the defense or otherwise uncontested by the parties—the focus would be on the grounds that the parties actually put in dispute at trial. The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.

\* \* \*

. . . [U]nder the rational-jury approach, the sentencing court could consider facts and circumstances that were not, in a practical sense, put in dispute at trial, as long as those facts and circumstances were otherwise consistent with the jury's acquittal on a particular charge. Moreover, if a specific fact or circumstance was relevant to both the acquitted charge and the convicted charge—i.e., if there was an overlap of relevant conduct—then the trial court could consider that fact or circumstance when sentencing on the convicted charge. [*Id.* at 6-7 (quotation marks and citations omitted).]

In this case, the jury found defendant not guilty of murder, armed robbery, and carjacking. When the rational-jury approach described in *Brown* is applied to the facts of this case, it is clear that the jury's verdict was predicated on its conclusion that the prosecution failed to prove beyond a reasonable doubt that defendant bore any responsibility for Deville's conduct with the gun. First, it is undisputed that defendant did not actually fire the gun. Second, because defendant was found not guilty of murder, it is clear that the jury was not convinced that defendant bore responsibility for Deville's decision to shoot the victim. Also compelling is the fact that the jury did not convict defendant of armed robbery, which required the prosecution to prove beyond a reasonable doubt that defendant possessed a dangerous weapon, possessed something that a reasonable person would believe is a dangerous weapon, or orally represented possession of a dangerous weapon. See MCL 750.529(1). And the jury's finding that defendant was not guilty of carjacking suggests that the jury was not convinced there was proof beyond a reasonable doubt that defendant used force or violence, or the threat of force or violence. See MCL 750.529a(1).

The jury acquitted defendant of all of the offenses that involved the use of a weapon. The rational-jury approach requires that the focal point be the issues disputed at trial, and the central dispute of the trial in this case was defendant's role in the shooting of the victim. See *Brown*, ___ Mich App at ___; slip op at 7. The jury's verdicts made it clear that it found that the prosecution failed to prove that defendant possessed a firearm, and the facts do not establish that he possessed another type of weapon. Accordingly, the court's assessment of 25 points for OV 1 was based on its impermissible consideration of acquitted conduct.[2]

Because this issue is unpreserved, defendant has the extra burden of establishing plain error affecting substantial rights. *Carines*, 460 Mich at 763. "A 'clear or obvious' error under the second prong is one that is not subject to reasonable dispute." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted). Based on the above discussion of acquitted conduct, it cannot be disputed that the trial court violated *Beck*. The error affected defendant's substantial rights because he was given a sentence within the guidelines range, but his range was erroneously high. *Carines*, 460 Mich at 763. Finally, it would be detrimental to the fairness, integrity, and public reputation of judicial proceedings for a person to spend more time in prison than warranted because of a violation of his due-process rights. *Id*. Accordingly, defendant has satisfied the requirements of plain error review, *id*.,[3] and defendant's sentences must be vacated.[4]

---

[2] Because we agree that the court improperly considered acquitted conduct, we decline to consider defendant's argument that the court considered conduct outside the scope of the sentencing offense.

[3] Because defendant has established plain error affecting substantial rights, we need not reach defendant's argument that his trial counsel's failure to object to the scoring of OV constituted ineffective assistance of counsel.

[4] The prosecution does not explicitly dispute that OV 1 was improperly scored; rather, the prosecution argues that correcting this error would not actually impact defendant's guidelines range because higher scores should have been allocated to other offense variables. However, the prosecution is the appellee in this matter, so in order to have other variables corrected it would need to file a cross-appeal and then establish plain error. See MCR 7.207. The prosecutor may raise arguments regarding other variables at resentencing.

## III. CONCLUSION

We vacate defendant's sentences for first-degree home invasion and safe-breaking. This case is remanded to the circuit court for resentencing. On remand, the trial court shall score OV 1 at 0 points because the jury acquitted defendant of all of the charges alleging that he possessed a firearm, and the facts do not establish that he possessed another type of weapon.

We do not retain jurisdiction.


/s/ Sima G. Patel
/s/ Stephen L. Borrello
/s/ Douglas B. Shapiro