*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
August 24, 2023

v

No. 361970
Wayne Circuit Court
LC No. 19-008103-01-FC

RANDON MCMEEKINS,

Defendant-Appellant.

Before: O'BRIEN, P.J., and CAVANAGH and MARKEY, JJ.

PER CURIAM.

Defendant was convicted by a jury of involuntary manslaughter, MCL 750.321, and second-degree child abuse, MCL 750.136b(3). He was sentenced to 10 to 15 years' imprisonment for the manslaughter conviction and 6 to 10 years' imprisonment for the child-abuse conviction. The 10-year minimum sentence for the manslaughter conviction reflected a 49-month upward departure from the minimum sentence guidelines range. Defendant appeals by right the trial court's decision to depart from the guidelines range when imposing sentence and the extent of the departure. We affirm.

## I. BACKGROUND

This case arises from the death of BP while he was in defendant's sole care. At the time of his death, BP was two years old, and his mother, Ashanti Potter, was in a relationship with defendant, who was not the child's biological father. Defendant would occasionally babysit BP when Potter was at work. On September 26 and 27, 2019, defendant babysat BP at Potter's house while she was at work. At trial, Potter testified that she was potty training BP in September 2019, and that although BP was doing well with the training, he occasionally had accidents. Toward the end of her work shift on the morning of September 27, 2019, Potter's manager informed her that BP was in the hospital. Potter called defendant, and he confirmed that he was at the hospital with BP. Defendant told Potter that BP was having trouble breathing. When Potter arrived at the hospital, BP had already died. On observing BP's body, Potter noticed "indentations" on BP's chest that "looked like a . . . handprint." Additionally, Potter testified that defendant had "hit [BP] in his chest once before" because BP had been screaming. When Potter asked defendant what had

-1-

happened to BP, defendant told her that BP fell off the toilet onto the bathroom floor and started crying. BP had difficulty breathing so defendant took BP to the hospital. Defendant later admitted to Potter that he struck BP in the chest. Defendant told Potter that he attempted to perform CPR on BP and that was "how [BP's] heart got ruptured."

Detroit Police Department Officer Nicholas Blackwell testified that defendant informed him at the hospital that BP had been using the toilet at Potter's home while defendant was in another room. Defendant then heard a "thud" and found BP on the floor of the bathroom. Defendant told Officer Blackwell that he attempted to perform CPR on BP and then drove him to the hospital when he realized that the CPR efforts were not working. At the police station later that same day, defendant admitted to hitting BP in the chest, and he was subsequently arrested.

Dr. Teresa Nguyen, the medical examiner who performed BP's autopsy, observed injuries to BP's head, chest, back, and genitalia. Externally, BP had contusions on his left forehead, abrasions on his ear, and five contusions on his chest. Internally, BP suffered severe hemorrhaging within his neck and a rupture of the right atrium of his heart. Dr. Nguyen opined that BP's injuries were caused by "a significant amount of force . . . applied to the chest." Dr. Nguyen testified that BP's death was ruled a homicide because "the blunt trauma to the chest, and the other injuries, could not have been done by [BP himself]."

Defendant testified on his own behalf. According to defendant, on the morning of the incident, he woke BP up and told him to use the bathroom. BP then went into the bathroom, and defendant went to a separate room to get clothes for BP. Defendant testified that BP was potty training at the time, so defendant did not supervise BP while he was in the bathroom. Defendant did not hear BP open the lid to the toilet, so he went back to the bathroom to check on him. Defendant then saw that BP had urinated on himself. Defendant conceded that he "popped him" with an "open hand" and put BP on the toilet. Defendant left the bathroom to retrieve BP's clothes but returned when he heard BP start to cry. When he reentered the bathroom, defendant could see that BP had fallen "facing the . . . back of the toilet." Defendant picked up BP, called his name, and splashed water on his face. Defendant testified that BP was unresponsive, and defendant attempted to perform CPR. Defendant then took BP to the hospital without calling 911. At the hospital, defendant told the staff that BP had hit his head and was not breathing.

On cross-examination, defendant testified that he "popped [BP] for peeing on the floor" and that it "was a disciplinary act." Defendant also asserted that BP never fell off the toilet. Defendant admitted that BP was "fine" before defendant popped him. Defendant testified that he did not tell the hospital staff or the officer at the hospital that he had hit BP because he "did not believe that [BP] bein[g] popped contributed to the case, or the reason, of why [BP was injured]."

The jury was presented with four counts to consider with respect to the verdict form. In regard to Count I, the jury could find defendant guilty of first-degree felony murder, guilty of the lesser offense of second-degree murder, or not guilty. The jury ultimately could not come to a unanimous verdict as to Count I. Count II concerned a charge of first-degree child abuse, and the jury could find defendant guilty or not guilty of first-degree child abuse. The jurors rendered a verdict of not guilty. With respect to Count III, the jury could find defendant guilty or not guilty of involuntary manslaughter. The jury found defendant guilty of involuntary manslaughter. Count IV concerned a charge of second-degree child abuse, and the jury could find defendant guilty or

not guilty of second-degree child abuse. The jurors found defendant guilty of second-degree child abuse.

Defendant was sentenced on June 1, 2022. His minimum sentence guidelines range for the involuntary-manslaughter conviction was 36 to 71 months' imprisonment. In pertinent part, the trial court imposed a sentence of 10 to 15 years' imprisonment for the manslaughter conviction, which amounted to a 49-month upward departure. The trial court explained its ruling as follows:

> Now, uhm, the Court's allowed to take into account, not only the actual conviction, but the evidence. And I, I think the evidence, uhm, in this case, speaks as loud, or even louder than the actual convictions. [Defendant] never told the truth, about what happened. He, he first made up a story. And then, changed it. But even the changed story wasn't the truth. And then, not even the version he gave, on the witness stand, the, the version . . . ended up being that he smacked him in the chest, with a, with a back of his hand. That wasn't the whole truth. Now, I, I almost can't blame the defendant for not telling the whole truth, because if he did, he would have to admit that he committed multiple assaults on this young man. The rupture of his heart was bad enough. What kind of force does it require to hit a two year old child, and rupture his heart? But that, it wasn't even that. There's a recapitulation in the pre-sentence report, the autopsy found that the child had bruising on the inside of his chest; a ruptured right heart, with a large amount of blood in the heart cavity; hemorrhages on the both sides of his neck muscles; bruises on his scrotum . . .; bruises on the left side of his head; and an unknown injury to his right cheek, and behind the right ear lobe. Caused by one blow? Not possible. It was caused by multiple blows. And so, I'm, you know, I'm really, you know, I understand why [defendant] can't admit to that, because, he would have to be . . . admitting to a vicious attack on this young man. And that's what it was. Born out of anger, about potty training. I'm sure that, uhm, many people involved in this case, uh, the family would, uhm, there are a number -- let me put it a different way. There are a number of factors that go into what is a proper sentence. And, uh, I have never felt that revenge, retribution, by itself, is a controlling factor. Because where, where does that get us? Somebody said, if you, when you plan revenge, dig two graves. But there's something that resembles revenge, which, in the Court's view, is a legitimate consideration. And the way I phrase it, that a Judge, particularly in a serious case, should take into consideration the assuagement, I say, of the legitimate indignation, of the victim, the victim's family, and the public. The point being, not so much that we're just here to put people in jail, and lock them up, to satisfy the, the Judge's anger, or -- but the point is, is that the victim, now the victim's dead in this case. But the victim's family, and the public at large, needs to feel that there's, some justice has been accomplished. That the end result, in some way, counterbalances the extreme, the extreme conduct, the viciousness of the conduct, whatever it happens to be, in the particular case. Otherwise, there's no confidence in the justice system. That, alone, is an important part. And it just seems to the Court that, that consideration leaps out at us, in this case. We have a defendant, regardless of what kind of a, a life he lived before that, who committed a brutal, and vicious attack on a two year old. A helpless two year old. For what reason? Out

of anger. At a potty incident? It just seems to the Court that the community deserves not to be appalled, as a result of such a case. Tell you the truth, I think that [defendant], in, in some way, is -- should be grateful for the result of this case. There's no need to make the decision, but it could be argued that the verdict would have justified a verdict of first degree felony murder in this case. And it's quite possible that the conviction of manslaughter was a compromise. The sentencing guidelines are useful, but they are mute statistics, that cannot take into account the . . . full reality of the particulars, in every given instance. There, they are a, a remarkful, remarkable tool, and often useful. But, uhm, there are times that they're simply inadequate to account for the vagaries of any particular case. And for these reasons, the Court is going to diverge from the guidelines. . . . . [Reformatted.]

Defendant appeals by right his sentence for the offense of involuntary manslaughter.

## II. ANALYSIS

### A. STANDARD OF REVIEW AND DEPARTURE PRINCIPLES

This Court reviews for reasonableness "[a] sentence that departs from the applicable guidelines range." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). In *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017), our Supreme Court provided elaboration on the "reasonableness" standard, stating:

> [T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the "principle of proportionality" set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender."

Factual findings related to a departure must be supported by a preponderance of the evidence and are reviewed for clear error. *People v Lawhorn*, 320 Mich App 194, 208-209; 907 NW2d 832 (2017). For purposes of sentencing, "a court may consider all record evidence, including the contents of a PSIR,[1] plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015).

The key test is not whether a sentence departs from or adheres to the guidelines range but whether the sentence is proportionate to the seriousness of the matter. *Steanhouse*, 500 Mich at 472. "The premise of our system of criminal justice is that, everything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003). Sentencing judges are "entitled to depart from the guidelines if the recommended ranges are considered an inadequate reflection of the proportional seriousness of the matter at hand." *Milbourn*, 435 Mich at 661. A sentence within the guidelines might be disproportionality lenient. *Id.* "Where a defendant's actions are so

---

[1] PSIR stands for presentence investigation report.

-4-

egregious that standard guidelines scoring methods simply fail to reflect their severity, an upward departure from the guidelines range may be warranted." *People v Granderson*, 212 Mich App 673, 680; 538 NW2d 471 (1995).[2] In *People v Lampe*, 327 Mich App 104, 126; 933 NW2d 314 (2019), this Court indicated that the factors that may be considered by a trial court under the proportionality test include, but are not limited to, the following:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [Quotation marks and citation omitted.]

"[A] trial court must justify the sentence imposed in order to facilitate appellate review, which includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017) (quotation marks and citations omitted). "When fashioning a proportionate minimum sentence that exceeds the guidelines recommendation, a trial court must justify why it chose the particular degree of departure." *People v Smith*, 482 Mich 292, 318; 754 NW2d 284 (2008). We note that our Supreme Court has now held "that due process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." *People v Beck*, 504 Mich 605, 629; 939 NW2d 213 (2019).

## B. DISCUSSION AND RESOLUTION

Defendant argues that the 10-year minimum sentence for the manslaughter conviction was unreasonable and disproportionate. In examining the trial court's ruling, we discern the following reasons for the upward departure: defendant's continuous and repeated lies regarding what happened; the sheer brutality and viciousness of the crime involving a two-year-old child and extensive bodily injuries, some of which were horrific; simple justice; the appalling reason that drove defendant's conduct, i.e., a potty accident by a two-year old who was just learning to use a toilet; and the inadequacy of the guidelines in light of the vagaries of the case. We conclude that in light of the full nature of the crime perpetrated by defendant, the 10-year minimum sentence imposed by the court was patently reasonable given that it was proportionate to the seriousness of the circumstances surrounding the offense. Dr. Nguyen testified that there was a significant amount of force employed against BP that caused a rupture of the atrium. Dr. Nguyen further observed:

> [T]here were multiple areas of the hemorrhage, and the soft tissue, surrounding that area. There was hemorrhage within the right atrium, as well as hemorrhage by the superior vena cava, and the right brachiocephalic vein, which

---

[2] We emphasize, however, that although the guidelines are no longer mandatory, they remain a highly relevant consideration for purposes of exercising sentencing discretion, and trial courts must consult and take into account the guidelines when imposing sentence. *Lockridge*, 498 Mich at 391.

are vessels of the heart. There was also hemorrhage, or bleeding, uhm, seen, on the thymus gland.

Defendant's actions were sufficiently egregious such that the guidelines simply failed to account for the severity of his conduct. A minimum sentence just under six years, which was the top end of the guidelines range, could certainly be deemed disproportionality lenient.

Defendant, appearing to make a *Beck* argument without citing the opinion, complains that the trial court believed that the jury's verdict was a mistake. We initially note that defendant was not *acquitted* of first-degree or second-degree murder. See *Beck*, 504 Mich at 629. Regardless, the court expressly remarked that it was not deciding whether a first-degree felony murder verdict was justified. The court merely mentioned that defendant should be grateful that he was not convicted of murder, and we agree with that assessment. Contrary to defendant's argument, the trial court did not rule that it was departing from the guidelines because the jury's verdict was a mistake. Defendant contends that the trial court failed to justify *the extent* of the upward departure or explain why the imposed minimum sentence was more proportionate than one within the guidelines range. Although the trial court did not use precise express language on those two matters when articulating the reasons for the departure, the court's thoughtful explanation for the departure made clear, perhaps only implicitly, that the 10-year minimum sentence was more proportionate than a guidelines sentence and that a four-year departure was appropriate because of the egregious brutality of the crime, defendant's incessant lying, and the appalling reason for the assault. We conclude that resentencing is unwarranted.

We affirm.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Jane E. Markey