*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

BRYAN VAN CYMAN,

        Defendant-Appellant.

UNPUBLISHED
September 19, 2024

No. 365806
Livingston Circuit Court
LC No. 2022-027385-FH

Before: RICK, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Defendant appeals as of right the sentence imposed in relation to his jury-trial conviction of third-offense domestic violence, MCL 750.81(3); MCL 750.81(5). Relevant to this appeal, the jury found defendant not guilty of assault by strangulation. The trial court departed from the advisory guidelines range and sentenced defendant, as a second habitual offender, MCL 269.10, to 5 to 7 ½ years in prison. We affirm.

## I. FACTUAL BACKGROUND

Defendant and the victim were in an intermittent romantic relationship that lasted approximately 10 years. His conviction resulted from a violent encounter between the two. The victim testified that on the day before the incident occurred, she and defendant visited a bicycle shop, where defendant purchased bicycles for both of them. The victim stated that they left with a small bag of bike accessories, including a brake cable. The victim further stated that defendant drank excessively on that day and argued with her about a relationship she was involved in while she and defendant were briefly separated. The victim stated that she and defendant argued in the car for about an hour after leaving the bike store. The victim went to defendant's house, but ultimately returned to her own home.

The next morning, the victim returned to defendant's residence. Their argument continued. According to the victim, it was an ordinary day until defendant began drinking in the afternoon. The victim stated that in the past, defendant would get drunk and threaten her, including threatening to break her arm, which had previously been severely broken. Defendant also threatened to kill her. The victim testified that she decided to leave defendant's house at around

1:00 p.m. because his intoxication and agitation were increasing and she believed that it would not get better. She continued that defendant threatened to call the police to have them stop her from driving because she had smoked marijuana. She explained that she ingested marijuana for the pain in her arm.

The victim testified that she told she defendant she was leaving and was gathering her belongings. Defendant, who was sitting at a table at the end of a hallway, threatened her with a grilling fork, so she retreated to the bedroom. The victim decided to take a bath in an attempt to calm the environment, but defendant took her clothes while she was bathing. Instead of leaving, the victim went to bed to take a nap. She stated that defendant continued to yell at her in a drunken state and she told him that she did not want to continue the conversation. The victim continued that defendant flipped her off of the mattress and then choked her with a bicycle brake cable until she lost consciousness. When she came back to consciousness, defendant was recording her. The victim stated that she hid under the dislodged mattress. She further testified that the next event she remembered was a friend arriving to help her.

The victim testified that she did not know how the friend got involved, but that she later learned that defendant had sent a message to someone, who eventually asked the friend to pick her up from defendant's house. The victim continued that defendant eventually retrieved her stolen clothes from a cooler inside of her car. The victim further testified that defendant gave her the receipt for the new bikes while he told her friend that he did not know why she was upset, especially since he had purchased a bike for her. After the victim's friend helped the victim get dressed and gather her belongings, the victim returned to the bike store and picked up the bike that was purchased for her. As she was driving away, the store manager accused her of theft and attempted to stop her from taking the bike. The victim explained that defendant had called the manager and informed her that the victim did not have permission to take the bike.

The police later went to the victim's house to investigate the alleged bicycle theft. While the officer was speaking with the victim regarding the bike, the victim's friend persuaded her to disclose that defendant had been violent with her earlier in the day. The officer documented bruising on the victim's shoulder and abrasions around her neck. The officer spoke to defendant, who denied the assault. At trial, defendant testified that he called someone to come pick the victim up from his house because she had barricaded herself in a room with a mattress and was talking about suicide. He further testified that the victim stole the receipt for the bicycle from his house, leading him to call the bike shop in an attempt to prevent her from taking the bike without permission. Defendant was later convicted and sentenced for committing domestic violence. He was acquitted of the greater charge of assault by strangulation. This appeal followed.

II. ANALYSIS

Defendant argues that his sentence is disproportionate and unreasonable, and that he is therefore entitled to resentencing. We disagree.

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is an abuse of discretion." *People v Dixon-Bey*, 321 Mich App 490, 520;

909 NW2d 458 (2017) (alteration in original; quotation marks and citation omitted). A trial court abuses its discretion by making a ruling that falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). Further, "a trial court necessarily abuses its discretion when it makes an error of law." *People v Hawkins*, 340 Mich App 155, 173; 985 NW2d 853 (2022).

Although the sentencing guidelines are advisory, "they remain a highly relevant consideration in a trial court's exercise of sentencing discretion." *Lockridge*, 498 Mich at 391; see also MCR 6.425(D). "[T]he appropriate sentence range is determined by reference to the principle of proportionality; it is a function of the seriousness of the crime and of the defendant's criminal history." *Babcock*, 469 Mich at 264. Trial courts must consult the guidelines when imposing a sentence, but may exercise their discretion to depart from a defendant's sentencing guidelines range. *Lockridge*, 498 Mich at 391. A trial court imposing a sentence may consider numerous factors under the proportionality standard, including, but not limited to:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expression of remorse, and the defendant's potential for rehabilitation. [*People v Lampe*, 327 Mich App 104, 126; 933 NW2d 314 (2019) (quotation marks and citation omitted).]

The principal test for determining proportionality turns on "whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range." *Dixon-Bey*, 321 Mich App at 521 (quotation marks and citations omitted).

Defendant's guidelines range for third-offense domestic violence, as a second habitual offender, was 14 to 36 months. The trial court issued a departure sentence of 60 to 90 months, or 5 to 7 ½ years. Defendant's minimum sentence thus constituted a two-year upward departure from the maximum 36-month sentencing recommendation. This was the harshest sentence the court could impose without violating the rule set forth in *People v Tanner*, 387 Mich 683, 690; 199 NW2d 202 (1972), which states that "any sentence which provides for a minimum exceeding two-thirds of the maximum is improper as failing to comply with the indeterminate sentence act." See also MCL 769.34(2)(b).

## A. *PEOPLE v BECK*

Defendant raises a number of issues with the court's sentencing decision. He first argues that the trial court relied on acquitted conduct during sentencing, in violation of *People v Beck*, 504 Mich 605; 939 NW2d 213 (2019). Specifically, he claims that during sentencing, the court considered that he allegedly strangled the victim with a bicycle-brake cable. Defendant points out that he was found not guilty by the jury of assault by strangulation. Under *Beck*, a defendant is presumed innocent of any charge of which a jury has specifically found the defendant not guilty, and a trial court may not consider such acquitted conduct as an aggravating factor at sentencing. *Id*. at 626-627.

The record indicates that the trial court did note that defendant was found not guilty of assault by strangulation. The trial court continued:

> [I]t was a little frustrating to the court in a way that there was a report of [the victim's] having a bicycle wire, line, brake line or whatever it was, wrapped around her neck and there was still a mark there. And when police arrived at the scene, they took a photograph of that—of her neck. It clearly showed an injury due to the brake line. But, then again, the jury was not convinced, obviously, that that crime occurred. And again, you don't know what happens back in that jury room. The jury itself—it might have been a little confusing in this case because the story that [the victim] testified to, and what [defendant] testified to, were vastly different.

The trial court later revisited the jury's decision to find defendant not guilty of assault by strangulation, stating that "the evidence was lacking," and questioning why "the trooper didn't go in and look in the house to see if that brake line was in the house." The trial court stated that "it would have been good if there was evidence of that," but "[t]here wasn't."

Defendant argues that the trial court's statements indicated that it was holding him accountable for assault by strangulation. He posits that the trial court considered him actually guilty of strangulation during sentencing. However, at most, all the court did was acknowledge that defendant was found not guilty of assault by strangulation. The trial court hinted that the jury could have evaluated the evidence differently, but respected the jury's determination that the evidence was lacking. To merit resentencing, a defendant must demonstrate that the trial court "actually relied on acquitted conduct when imposing [a] sentence." *People v Beesley*, 337 Mich App 50, 63; 972 NW2d 294 (2021). Ultimately, none of the comments cited by defendant indicated that the court violated *Beck* while fashioning defendant's sentence.

## B. RELIANCE ON INACCURATE INFORMATION

Defendant also argues that the court relied on inaccurate information during sentencing. At one point, the court stated that it "couldn't understand why the trooper didn't go in and look in the house to see if that brake line was in the house," to which defense counsel responded, "He did." The court disagreed, noting again that the police did not search the house for the brake line used to strangle the victim.

"A defendant is entitled to be sentenced by a trial court on the basis of accurate information." *People v Francisco*, 474 Mich 82, 88; 711 NW2d 44 (2006). "[A] sentence is invalid if it is based on inaccurate information." *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997). "[T]he use of inaccurate information at sentencing may violate defendant's right to due process." *People v Sharp*, 192 Mich App 501, 509-510; 481 NW2d 773 (1992).

At trial, the investigating officer testified that defendant walked him through the home, and the officer initially did not recall whether he looked for, or found, "any brake lines." Defense counsel then re-asked, "Did you look for a brake line?" to which the officer responded, "I did, and I don't recall if I found one or if I did not." Thus, defendant correctly points out that the officer testified that he did look for such a thing. However, although the trial court was mistaken to the extent that he remembered otherwise, there is no suggestion that the trial court based its sentence

on that misunderstanding. The discussion took place while the trial court was recounting the lack of evidence of the assault by strangulation. The trial court acknowledged that defendant was not guilty of the charge as it began its review of what had occurred at trial. That the trial court was confused regarding the extent of the lack of such evidence had no bearing on the trial court's justification for its sentence in relation to third-offense domestic violence. Rather, any misapprehension in this regard was harmless.

## C. REPRESENTATION BY COUNSEL

Defendant also argues that the trial court improperly based the sentence on its frustration with defense counsel's zealous representation. A court "may not consider factors that violate a defendant's constitutional rights" when it sentences a defendant. *People v Godbold*, 230 Mich App 508, 512; 585 NW2d 13 (1998). Defendant asserts that his departure sentence was a response to defense counsel correcting the court about whether the police had searched for a brake cable, and for successfully arguing that defendant was not guilty of assault when the trial court believed otherwise.

At trial, defense counsel remarked that the victim "lied to this court," about the circumstances leading to defendant's conviction. At sentencing, the trial court stated:

> If anyone's a liar, it's [defendant]. I am offended that [defense counsel] is stating that [the victim] was the one who was a liar. [Defendant] was the one who pointed it out to the jury, I've been sober for so many days, trying to make himself look good to the jury, I guess. He's a sober person. He's a nice guy.
>
> And until that time, no one knew, except the court of course, that he was incarcerated. So the question was asked of [defendant], how many days that you've been sober, how many days have you been incarcerated. Well he was incarcerated; that's the reason why he was sober. But he really tried to mislead this jury on that one point.

The trial court then offered some clarification: "Is that the biggest point? No. Was the bike situation the biggest point? Not really. However, for him to have come to a jury trial and make that statement—he does have a right to testify, but to try to mislead the jury was not very smart of him."

Thus, the trial court did negatively comment on defendant's truthfulness, noting his misleading testimony about his sobriety, but it did not specifically comment on the jury's determination that defendant was guilty of domestic violence despite his denials. Contrary to defendant's argument on appeal, the record does not indicate that the trial court expressed personal feelings that improperly influenced its sentencing decision. In fact, the trial court explicitly diminished the importance of the exchange about the victim's truthfulness, pointing out that it was not the "biggest point."

Defendant also asserts that a statement made by the trial court indicating that "juries don't always understand" supports the theory that the court acted in opposition to the jury's verdict out of frustration, or that the trial court expressed that it knew better than the jury in terms of

defendant's guilt. However, this comment was made in the context of discussing the characteristics of domestic-abuse survivors, not the reasons behind the sentence. In full, the court stated:

> And as the victim states, he continued to harass her and she said he was on two bonds, both with no contract orders, but he continued to harass her. She ultimately dropped the charges in Reed City. That's what victims of domestic violence do. They can't take the abuse any more. She was a victim in every sense of the word: emotionally, mentally, physically, a broken individual. And with her situation, with her arm and being on disability, I can understand why she might have thought that maybe she could stay with him, but clearly, she shouldn't have. Again, it's a symptom of domestic violence, which I know all too well from hearing other victims come in here and say, oh, no. That black eye I have right now? No. He didn't hit me, when we know that he hit her. That happens.
>
> Courts understand that. Juries don't always understand that. The Court hears it day in and day out sometimes. But for the Defense attorney, on behalf of [defendant], to get up here and say [the victim]'s a liar, he was the one convicted, and he deserves to be penalized.

Despite the trial court's confrontation with defense counsel over the veracity of witness testimony, the court's statement was factually based and was merely a response to defense counsel's statement that the victim was a liar. Defendant has not established that it was delivered as part of the sentencing rationale.

## D. FACTORS CONSIDERED BY THE GUIDELINES

Defendant also argues that the bulk of the trial court's sentencing rationale placed significant weight on the fact that defendant had previously been violent toward the victim, which was already accounted for in the prior record variable (PRV) score for defendant's third-offense domestic-violence conviction. "A departure from the recommended range in the absence of factors not adequately reflected in the guidelines should alert the appellate court to the possibility that the trial court has violated the principle of proportionality and thus abused its sentencing discretion." *People v Milbourn*, 435 Mich 630, 660; 461 NW2d 1 (1990). Defendant cites the following portion of the trial court's statements in support of his argument:

> The victim has been with [defendant] for years and it's unfortunate because it sounds like a tumultuous relationship, horrible relationship. But since the incident where [defendant] was in a car with the victim and made that—I don't know if the victim chose to get out of his car or if he made her get out of the car. It doesn't really matter. She's walking along the street, and then gets hit by a car, and that's what caused her permanent damage to her arm. What does [defendant] do, . . . he does concentrate on hurting the victim on that arm.

However, the trial court explicitly described how the guidelines were inadequate when stating, "After reading [the presentence investigation report (PSIR)] and after reviewing the guidelines, I just thought, there is no way this could be the guidelines for committing domestic violence third,

and being a habitual offender second. He has 14 prior misdemeanors, one prior felony . . . . He had a juvenile record, as well." After detailing additional "torture, battering, [and] manipulation," and stating that describing the effect on the victim as "[t]raumatic is an understatement," the trial court remarked, "I can't believe the guidelines are so low for such a vicious, violent attack for this whole incident." The court concluded, "I do find that the guidelines are not sufficient in this particular case. The facts in this case were egregious." The trial court also recounted that the victim had dropped charges in another jurisdiction relating to defendant's harassing her despite being on bond in two other cases. Thus, the trial court communicated facts that were *not* already accounted for in the guidelines as the basis for its departure sentence.

Additionally, even though PRV 1 accounted for the one "prior high severity felony conviction[]," MCL 777.51, to which defendant refers, and his PRV 5 score of 15 accounted for several of the 15 or more "prior misdemeanor convictions or prior misdemeanor juvenile adjudications," MCL 777.55(1)(b), the trial court referenced adjudications beyond those accounted for, along with uncharged conduct, and the particular behaviors involved, as justification for the departure. For these reasons, we are satisfied that the sentencing court reasonably concluded that the scoring of the sentencing variables did not sufficiently account for the circumstances of the offense and offender.

## E. PROPORTIONALITY

Defendant also generally contends that his sentence was not reasonable or proportionate. Our review of the record indicates that the trial court offered extensive remarks from the bench in support of its sentence, and that they largely covered the sentencing rationales discussed in *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972), including "(a) the reformation of the offender, (b) protection of society, (c) the disciplining of the wrongdoer, and (d) the deterrence of others from committing like offenses." During sentencing, the court reviewed the victim-impact statement, in which she noted that the victim completed a "lethality assessment that was published by the National Institute for Justice," and scored in the "very grave risk of being killed" range. The trial court observed that it believed defendant was a "truly violent individual" and expressed uncertainty as to whether he could be reformed. The court explained that, according to the victim impact statement, defendant knew the victim had a severely injured arm due to being hit by a car and would specifically target that arm while abusing her, to the point that the hardware in the arm would break. The trial court also noted that the victim had "endured a lot of abuse," and that on one occasion, while she was in the hospital, defendant told her that he hoped that she would die in surgery. The court added that defendant had used money that the victim received as a settlement from her accident to purchase land from a friend and kept the victim off of the deed. The trial court stated that the victim's statement was "something that I don't think I'll ever forget."

The trial court recounted that defendant's behavior in this case included that he "threatened her that he wanted to put [the victim] in a meat grinder and wood chipper, that he was going to buy a gun and kill her," and harassed her by calling 20 to 30 times a day. The court noted that defendant was incarcerated because he violated bond by testing positive for proscribed substances, and that he continued to contact the victim. The court concluded that there was "nothing positive about [defendant]. I think he's a horrible individual." The trial court endorsed the statement in the PSIR that "supervision can't be enough to protect the victim from [defendant]," stating, "that's my fear, too. I'm scared for her."

The trial court remarked, "Again, there are so many instances, I don't even know how this report could be written. It's just instance after instance of torture, battering, manipulation, all those things," despite no-contact orders and bond conditions. The court cited additional examples and then stated, "This is just a case of violence and torture over and over again for many, many years . . . . I know this isn't the only time [defendant] has hurt somebody . . . . You talk about reform. I don't know if he can be reformed."

The trial court ultimately determined that defendant had poor prospects for rehabilitation:

> I don't think [defendant] is a good candidate for probation under any circumstances. I don't think that he is a person for jail. I do not see him reforming. I have to protect the victim because she has been truly a victim with [defendant]. The penalty is just not sufficient under these guidelines, and I have to, again, deter him from ever committing this again.

The trial court remarked that defendant was "inhumane in his ways," adding, "If he ran a company, he made money, if he had a house and he had a significant other, why would he treat them like this? Why would you threaten to kill them? Why would you say, I'm going to put you in a meat grinder?"

The trial court concluded with reference to the victim-impact statement, citing the victim's report that defendant's ex-wife called her and encouraged her to follow through with pressing charges because the ex-wife was concerned that defendant would kill her. The trial court spoke of electronic messages purportedly from defendant, as referenced in the victim-impact statement, stating different ways that defendant wanted to kill her (murder-suicide, woodchipper), which the victim termed "a point of no return," indicating that "somebody is actually actively fantasizing different scenarios of killing me." The court then read the victim's statement that the violence was more than physical abuse that "destroyed my body," but was mental and emotional abuse that would "never heal" and "never go[] away." The trial court concluded, "It's all about control, manipulation, and abuse, and that's why I'm here. I need to protect the public. I need to protect [the victim] from [defendant]."

As stated *supra*, whether a sentence is valid depends on whether it "is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range." *Dixon-Bey*, 321 Mich App at 521 (quotation marks and citations omitted). Here, we conclude that the trial court provided ample justification for its sentence. The court discussed the barbaric threats defendant made while committing the sentencing offense. The court also discussed factors not considered by the guidelines. This included the cycle of abuse between defendant and the victim. The court justifiably observed that the victim required protection from the potentially lethal relationship she had been unable to leave and acknowledged defendant's continued threatening and intimidating conduct toward the victim while in custody.[1] The court

---

[1] Defendant objects to the trial court's reference to text messages recounted in the victim-impact statement of the PSIR on the ground that they acknowledged the unreliability of these messages

likewise considered defendant's extraordinary history of abusing the victim, despite numerous interventions, which reflected negatively on his potential for rehabilitation. The court also went to great lengths to explain what the guidelines did not adequately consider in this case, namely the need to protect society and prevent the continuation of acts of "torture, battering, [and] manipulation," over the course of years, by a person who the trial court doubted could be reformed. In *People v Horn*, 279 Mich App 31, 45; 755 NW2d 212 (2008), this Court stated that "specific characteristics of an offense and an offender that strongly presage future criminal acts may justify an upward departure from the recommended sentencing range if . . . they are not already adequately contemplated by the guidelines."

In sum, the departure sentence was within the range of reasonable and principled outcomes. The trial court provided ample justification for the departure sentence, including the seriousness of the offense and factors that were either not considered, or inadequately accounted for, by the guidelines. This included defendant's "inhumane" treatment of the victim and his poor prospects for rehabilitation. The trial court thus based its departure on consideration of "the nature of the offense and the background of the offender," *Milbourn*, 435 Mich at 651, by reasoning that rehabilitation was unlikely and that defendant therefore presented a substantial risk to the victim and community. The court further stated that the sentence should prioritize deterrence and punishment. It thus established by reference to matters of record that a departure sentence was "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Steanhouse*, 500 Mich at 474.

Affirmed.

/s/ Michelle M. Rick
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado

---

because they were shown to the victim by defendant's ex-wife. However, at sentencing, defendant affirmed the accuracy of the PSIR, which included the account of the messages. "When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a PSIR." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). Additionally, the trial court's references to the contents of the messages in the PSIR was one brief example of many that the trial court cited to illustrate defendant's failure to comply with no-contact orders, and the use of threats and violence in the relationship.